**SCHNADER HARRISON SEGAL & LEWIS LLP**
**LISA J. RODRIGUEZ, ESQUIRE**
**COURTNEY DEVON TAYLOR, ESQUIRE**
**Woodland Falls Corporate Park**
**220 Lake Drive East, Suite 200**
**Cherry Hill, New Jersey 08002-1165**
**Phone: 856-482-5222 ▪ Fax: 856-482-6980**

*Attorneys for Defendant/Counterclaim Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| INDECS CORP. AND WIREROPE WORKS, INC., | |
| *Plaintiffs and Counterclaim Defendants*, | |
| v. | Civil Action No. 2:16-cv-04421-KM-JBC |
| CLAIM DOC, LLC, | |
| *Defendant and Counterclaim Plaintiff.* | |

## AMENDED COUNTERCLAIM

Counterclaim Plaintiff Claim Doc, LLC ("Claim Doc"), for its amended counterclaim against Counterclaim Defendants INDECS Corp. ("INDECS") and Wirerope Works, Inc. ("Wirerope"), alleges as follows:

## NATURE OF THE ACTION

1.     The parties to this action contracted for the provision of health benefit claims auditing services.

2.     Contrary to the terms of the governing contracts, INDECS and Wirerope seek to burden Claim Doc with the expense of providing post-termination services.

3.      As part of INDECS' and Wirerope's effort to burden Claim Doc with the expense of providing post-termination services not required by the contracts, INDECS and Wirerope are holding hostage monies due to Claim Doc for work previously performed under the contracts, a clear violation of the contracts' express terms.

4.      And, as if this behavior were not sufficiently egregious, INDECS and Wirerope also have conspired to, and indeed did, intentionally and/or maliciously interfere with an existing contract between Claim Doc and certain third parties.

5.      Claim Doc brings counterclaims against INDECS and Wirerope for breach of contract, tortious interference with contract, and civil conspiracy.  Claim Doc also brings against Wirerope a counterclaim for quantum meruit/unjust enrichment related to Wirerope's bilking a Claim Doc affiliate of fees owed for the design and setup of Wirerope's 2016-17 and 2017-18 health benefits plans.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction over this action on the basis of diversity of citizenship as provided in 28 U.S.C. §1332.

7.      Venue is proper as provided in 28 U.S.C. §1391.

## FACTUAL BACKGROUND

**The Parties.**

8.      Counterclaim Plaintiff Claim Doc provides claim re-pricing and auditing services to employer and union sponsored self-funded health plans.

2

9.      Counterclaim Defendant INDECS represents itself to be a third party health care claims administrator, and provides claims management and administration services to self-funded healthcare programs.

10.     Counterclaim Defendant Wirerope is a manufacturing business with over 300 employees.

**Nonparty Benefit Captive Re Designs a Health Benefits Program for Wirerope and Facilitates Wirerope's Hire of Claim Doc and INDECS.**

11.     Nonparty Benefit Captive Re, LLC ("BCR") is a broker for self-funded benefit plans.  As a broker, BCR assists employer-sponsored health care benefits programs by designing, recommending, and facilitating contracts with various health care service providers.

12.     BCR is an affiliate of Claim Doc.

13.     For health benefit plans such as those that BCR designs, the design and preparation must occur well prior to enrollment so that enrollment may occur timely the following benefit plan year.

14.     BCR charges monthly fees to its clients throughout the benefit plan year.  The monthly fees are based on the number of employees in the plan that BCR designs, and mostly reflects compensation for the upfront setup of the plan, renewals, and implementation.  A small portion of the monthly fees also compensates BCR for assistance and reporting throughout the plan year.

15.     BCR sent to Wirerope a written proposal for the design and setup of Wirerope's health benefits plan for the 2014-15 plan year.  Wirerope accepted and signed the proposal.

16.     In April 2014, BCR became the broker of record for Wirerope's health program for its employees and eligible dependents.

3

17.     As Wirerope's broker, BCR implemented the design outlined in the proposal accepted by Wirerope.  In so doing, BCR facilitated agreements with health care providers on behalf of Wirerope, including for stop loss coverage, a third party administrator, a pharmacy manager, and claim auditing services.

18.     BCR facilitated for Wirerope agreements with Eye Center of Central Pennsylvania, Family Practice Centers, Susquehanna Endoscopy, Susquehanna Health System hospitals and physicians, and a local durable medical goods provider.

19.     For the 2014-15 benefit plan year, BCR facilitated Wirerope's hiring of Tristar Benefit Administrators as the third party administrator, and Claim Doc for claims review, audit, and negotiations services.

20.     For the 2014-15 benefit plan year, BCR charged Wirerope approximately $6,700 per month throughout the plan year.  This number fluctuated, as it reflected the number of employees enrolled in the plan each month.

21.     BCR sent to Wirerope a written proposal for design and setup of Wirerope's health benefits plan for the 2015-16 plan year.  Wirerope accepted and signed the proposal.

22.     As Wirerope's broker, BCR implemented the design outlined in the proposal accepted by Wirerope.  In so doing, BCR facilitated Wirerope's hiring of INDECS as its third party claims administrator.  Claim Doc continued to provide Wirerope with claims review, audit and negotiation services.

23.     For the 2015-16 benefit year, BCR charged Wirerope approximately $5,200 per month throughout the plan year.  This number fluctuated, as it reflected the number of employees enrolled in the plan each month.

**Claim Doc and INDECS Enter Into An Agreement for Services.**

24.     INDECS and Claim Doc entered into the Agreement for Claims Review, Audit, and Negotiation Services, effective June 1, 2015 (the "Agreement"). Ex. A.

25.     The Agreement engages Claim Doc to, "upon INDECS's written request[,] perform Claim Review Services for claims for medical and pharmacy services incurred by members covered by selected Plans for whom INDECS is acting as the Third Party Administrator." *Id.* at ¶1.

26.     "Claim Review Services" is defined in the preamble of the Agreement as "various review, auditing, and negotiating services for medical or pharmacy claims." *Id.* at preamble.

27.     The Agreement provides a compensation formula. The Compensation provision explains:

> [Claim Doc] shall receive a fee ("Services Fee"), as compensation for services provided hereunder, an amount equal to 12% of the first $100,000 of "billed charges" for a claim for which [Claim Doc] has performed services hereunder and 10% of the excess over $100,000 of billed charges for such claim. "Billed charges" are the total billed charges billed for the claim prior to any discounts or other reductions.

*Id.* at ¶8.

28.     The Agreement specifies that its initial term is one (1) year, beginning June 1, 2015, through May 31, 2016. Further, the Agreement "shall renew itself automatically for additional one-year periods of time, unless and until terminated by either Party in accordance with the provisions of this Section 10." *Id.* at ¶10.

29.     The Agreement also provides for the manner in which it can be terminated:

> This Agreement shall terminate as follows:

> a.      By either party with Notice.  Either
> Party to this Agreement may terminate it by
> giving sixty (60) days' prior written notice
> thereof to the other Party.
>
> b.      By [Claim Doc] Upon Failure to Pay
> Fees.  If INDECS and/or a Plan Sponsor
> does not pay the fees set forth in Section 8
> within ten (10) business days of the due
> date, [Claim Doc] may resign upon giving
> five (5) business days prior written notice
> and this Agreement shall immediately
> terminate.

*Id.* at ¶10.

30.     The Agreement includes a provision related to the rights and obligations of Claim

Doc and INDECS upon the termination of the agreement.  It explains:

> **Rights and Duties Upon Termination.**  As of the date of
> termination of this Agreement and the expiration of any run out
> period under any applicable Stop Loss Policy, all rights and
> obligations of the Parties shall terminate, except that (a) [Claim
> Doc] shall continue to perform its obligations under this
> Agreement with respect to any Referred Health Benefit Claim or
> Appeal of a Health Benefit Claim provided that the Plan Document
> continues to name the [Third Party Administrator] or the Plan
> Administrator as a designated decision maker with maximum
> discretionary authority with respect to such Referred Appeals; and
> (b) INDECS, shall pay on behalf of and with funds provided by the
> Plan Sponsors, all fees which are due and owing under this
> Agreement as of the date of termination.

*Id.*

31.     Under the Agreement, a "Health Benefit Claim" is "a claim for benefits filed by a

participant in the Plan, where the request for approval of treatment or services or the rendering of

services or supplies occurred during a Plan Year or calendar year applicable under the term of

this Agreement."  *Id.* at ¶2.

32.     Under the Agreement, a "Referred Appeal" is "any appeal of a denied Health Benefit Claim under the Plan, which shall be referred to [Claim Doc] by the Plan Administrator after audit under this Agreement by [Claim Doc]." *Id.*

33.     The characteristics of an appeal, in the context of employee benefits, are specified by federal law.  29 C.F.R. §§2560.503-1(h).

34.     An appeal must include a "full and fair review of the claim and the adverse benefit determination." *Id.*

**Wirerope Enters Into a Joinder Agreement with Claim Doc and INDECS.**

35.     The Agreement requires that "in order to provide such Claims Review Services to a[n] INDECS customer, the customer shall be required to enter into a Joinder Agreement [] with the Parties hereto." *Id.* at preamble.

36.     On June 1, 2015, Wirerope entered into a Joinder Agreement with INDECS and Claim Doc (the "Joinder Agreement") which incorporates the terms and conditions of the Agreement.  Ex. B.

37.     By the Joinder Agreement, Wirerope "represent[ed] and warrant[ed] that it is liable for all amounts due [Claim Doc] under the [] Agreement and this Agreement and that it is solvent and financially able to pay all such amounts." *Id.* at ¶5.

38.     The Joinder Agreement obligates Wirerope to ensure that Claim Doc receives payments for its Claims Review Services, as follows:

> …in the event INDECS fails to forward to [Claim Doc] compensation or other payments due hereunder in connection with [the Joinder Agreement] and/or the [] Agreement in a timely manner, upon notice to [Wirerope] by [Claim Doc], [Wirerope] shall make direct payments to [Claim Doc] for any unpaid amounts

or future payments due under [the Joinder Agreement], whereupon
INDECS shall be relieved of any liability therefor.

*Id.* at ¶6.

39.     The Joinder Agreement provides with respect to termination:

In the event the Client Services Agreement between [Wirerope]
and INDECS terminates prior to the expiration of the current plan
year of [Wirerope's] Health Plan and any run out period under the
applicable Stop Loss Policy, and [Wirerope] or INDECS on behalf
of [Wirerope] so requests in writing, [Claim Doc] shall continue to
provide services to [Wirerope's] Health Plan until the end of the
current plan year and the run out period, so long as payments due
under this Agreement are made when due.  This Agreement shall
survive the termination of the Client Services Agreement between
INDECS and [Wirerope] until the end of the current plan year,
after such termination and the end of any applicable Stop Loss Run
Out Period.

*Id.* at ¶8.

**INDECS Interferes with Claim Doc's Relationship with Wirerope.**

40.     While INDECS and Claim Doc were parties to the Agreement, INDECS
performed a series of acts intended to undermine Claim Doc's relationship with Wirerope.

41.     For example, in January 2016, the President of INDECS, Mike Shine, and
nonparty David Fishbone, who was acting as a consultant for INDECS, participated in a meeting
with representatives from Wirerope (the "January Meeting").   The purpose of the January
Meeting was, in part, to discuss the claims auditing services provided by Claim Doc.

42.     However, Claim Doc was not invited to, or informed of, the January Meeting.

43.     At the January Meeting, Fishbone and Shine informed Wirerope that they were
affiliated with a startup company called Claim Watcher, LLC ("Claim Watcher"), a competitor
to Claim Doc that would be managed and operated by INDECS.

8

44.     After the January Meeting, Fishbone became the sole employee of Claim Watcher.

45.     By way of another example, on May 6, 2016, while Fishbone was the sole employee of Claim Watcher, Mike Shine of INDECS Corp. transmitted to Wirerope a proposal by Claim Watcher (the "Proposal"). Ex. I.

46.     The Proposal identified material terms of the contract between Claim Doc and Wirerope, and offered somewhat more favorable terms to persuade Wirerope to terminate its relationship with Claim Doc.

47.     The Proposal was signed by Mike Shine, President of INDECS.

48.     However, Mike Shine, as President of INDECS, had no ability to set pricing for Claim Watcher. Rather, Shine knowingly and intentionally functioned as a conduit through which Fishbone and Claim Watcher could transmit information to Wirerope.

49.     Only days after receiving the Proposal to Wirerope, Wirerope engaged Claim Watcher to provide its claims auditing and review services.

50.     At the time that Shine transmitted the Proposal to Wirerope, INDECS, Wirerope and Claim Doc were still subject to the terms and conditions of the Joinder Agreement.

51.     Further, at the time that Shine transmitted the Proposal, INDECS and Claim Doc were still subject to the terms and conditions of the Agreement.

**Wirerope's Relationship with BCR Ends, and Wirerope Bilks BCR of Payment for Services Rendered.**

52.     BCR sent to Wirerope a written proposal for the design and setup of Wirerope's health benefits plan for 2016-17 plan year. In putting together the proposal, BCR performed all

9

of the work for the plan setup for that year, such as gathering all data necessary for renewal quotes for stop loss.

53.      As with the previous proposals, BCR proposed a monthly fee to cover the design and setup of the plan.

54.      Wirerope did not sign BCR's proposal for the 2016-17 plan year, and, on May 10, 2016, notified BCR by telephone of its intention to terminate the relationship.

55.      Upon information and belief, Wirerope then implemented the entire health benefits program that BCR had designed for Wirerope for the 2016-17 plan year, except that Wirerope did not continue its relationship with BCR and its affiliate, Claim Doc.

56.      Wirerope did not compensate BCR in any way for designing and setting up the health benefits program for the 2016-17 plan year.

57.      BCR has assigned to Claim Doc its rights and interest in any claims against Wirerope related to Wirerope's failure to compensate BCR for the design and setup of the health benefit program for the 2016-17 plan year.

58.      For the 2017-2018 plan year, Wirerope again implemented the health benefits program designed and setup by BCR.

59.      Wirerope did not compensate BCR in any way for designing and setting up the health benefits program for the 2017-2018 plan year.

60.      BCR has assigned to Claim Doc its rights and interest in any claims against Wirerope related to Wirerope's failure to compensate BCR for the design and setup of the health benefit program for the 2017-2018 plan year.

**Claim Doc's Relationship with Wirerope and INDECS Ends.**

61.   To avoid any misunderstanding about the relationship between Wirerope and Claim Doc, Claim Doc sent to Wirerope a letter, dated May 11, 2016, terminating their relationship. Ex. D.

62.   That Letter explains, in part:

> After July 2, 2016, we will continue to respond to any Referred Appeals beyond the date of termination for those Claims that were audited pursuant to the Agreement, even if the Appeal itself is served on us after the date of termination. However, following July 2, 2016, pursuant to the terms of the Agreement, we will no longer provide balance bill representation or continue to represent those members with balance bills that remain pending.

*Id.*

63.   A balance bill reflects a patient's responsibility to pay the difference between the amount a health care provider charged and the amount that the plan paid that provider. The remaining balance equals the amount of money the auditor determined was not payable under the allowable claim limit.

64.   On May 11, 2016, Claim Doc also provided written notice to INDECS of its intent to terminate the Agreement. Ex. C.

65.   The letter indicates that the Agreement would terminate on July 2, 2016. *Id.*

66.   During the life of the Agreement, Claim Doc charged INDECS, and by extension Wirerope, about $417,832.46. Of that sum, INDECS and/or Wirerope paid only about $303,701.73.

**INDECS and Wirerope Demand that Claim Doc Provide Services Beyond What is Required by the Governing Contracts and Refuse to Compensate Claim Doc for Services Already Rendered.**

67.     Despite the terms of the Agreement, INDECS has asserted that Claim Doc has a post-termination obligation to provide legal defense of post-termination balance bills. Ex. E.

68.     In an effort to support this contention, INDECS cites language from the Agreement that states that Claim Doc "shall continue to perform its obligations under this Agreement with respect to any Referred Health Benefit Claim or Appeal of a Health Benefit Claim." *Id.*

69.     Claim Doc has explained to INDECS that balance bill defense is not a duty upon termination of the Agreement. Ex. F.

70.     Indeed, nowhere in the "Rights and Duties Upon Termination" section of the Agreement is there any reference to balance bill defense or balance bills generally. Ex. A at ¶10.

71.     Likewise, federal law does not include in its description of "full and fair review" of adverse benefit determinations any reference to balance bill defense. 29 C.F.R. §§2560.503-1(h)(a) and (2).

72.     Nonetheless, INDECS sent to Claim Doc a letter dated July 5, 2016, characterizing Claim Doc's assertion that balance bill defense is not a duty upon termination of the Service Agreement as a "notice of anticipatory breach." Ex. G.

73.     In that correspondence, INDECS also stated the following:

> 1. INDECS will assume responsibility for supplying the services Claim Doc has breached its duty to provide (a legal defense of balance bills with respect to the plan members of Wirerope Works, Inc.) Claim Doc was obligated to provide

those services post-termination under ¶1(e) of the Agreement.

2. INDECS will reserve any funds on hand to do so, in a good faith estimate of the expenses of the services required. Claim Doc's breach eliminates any need to pay over any money to Claim Doc in any case.

3. Claim Doc will be required to pay any excess costs INDECS incurs to provide legal defense of balance bills for plan members of Wirerope Works, Inc. Should Claim Doc refuse to pay any legal defense costs, INDECS will seek recovery from Claim Doc through legal action.

4. Claim Doc will provide any claim data necessary, including all correspondence and information of any kind, required to provide a legal defense of balance bills for the plan members of Wirerope Works, Inc.

*Id.*

74.    To date, INDECS has not paid Claim Doc the outstanding balance for services rendered between October 2015 and June 2016, which amounts to at least $114,432.46.

75.    On July 8, 2016, Claim Doc notified Wirerope of its obligation to pay the outstanding balance pursuant to the terms of the Joinder Agreement. Ex. H.

76.    Wirerope did not respond.

77.    To date, Wirerope has not paid the outstanding balance.

**INDECS and Wirerope Interfere with Claim Doc's Contract with A Third Party.**

78.    Nonparty David Fishbone is the owner of Needham Business Consulting PA, LLC (collectively "Needham").

79.    Between February 1, 2013 and March 25, 2016, Needham was under contract with Claim Doc to provide certain business services.

80.     On March 25, 2016, Needham and Claim Doc entered into a separate agreement

(the "Settlement Agreement"), which explains that:

> 6. Commencing on March 10, 2016, Needham shall
> have no contact, directly or indirectly, with
> Wirerope Works, Inc., Gardner Trucking, Inc. and
> Susquehanna Hospital System for the purpose of
> convincing any of them to alter or terminate their
> relationship with Claim Doc, for the same duration
> as payments are made under this settlement term
> sheet.  For purposes of satisfying its obligation to
> have no indirect contact with Wirerope Works, Inc.
> for the purpose of convincing it to alter or terminate
> its relationship with Claim Doc, Needham shall
> establish a "Chinese Wall" to isolate itself from
> information about Wirerope Works, Inc.'s choices
> of vendor for the coming year.... [1]

81.     Upon information and belief, after the execution of the Settlement Agreement and

while Claim Doc was still making payments under the Settlement Agreement, Fishbone and

Needham communicated with representatives of Wirerope and INDECS and advocated that

Wirerope replace Claim Doc with Claim Watcher.

82.     For example, Fishbone provided Claim Watcher pricing information to INDECS

for transmission to Wirerope in the Proposal.

83.     Upon information and belief, as a result of Fishbone's and Needham's

communications and the Proposal, Wirerope hired Claim Watcher as its claims auditor.

### Count I
(Breach of Contract Against INDECS)

---

[1]     This language is quoted from the Settlement Agreement, whose terms require it to "be
maintained in the strictest confidence."  For this reason, the Settlement Agreement has not been
attached as an exhibit to the counterclaim.

84.     Defendant hereby incorporates by reference each and every allegation in the Counterclaim as though the same were fully set forth herein.

85.     Claim Doc and INDECS entered into the Agreement, which is a valid contract supported by law.

86.     The Agreement requires INDECS to pay Claim Doc as compensation a Services Fee, as defined in the Agreement. Ex. A at ¶8.

87.     The Agreement also requires that INDECS shall, upon termination of the Agreement, "pay...all fees which are due and owing under this Agreement as of the date of termination." *Id.* at ¶10.

88.     During the 2015-16 benefit plan year, Claim Doc provided to INDECS and Wirerope the Claim Review Services outlined in the Agreement.

89.     INDECS did not pay all fees due and owing under the Agreement as of July 2, 2016, which was the date of the Agreement's termination.

90.     Indeed, to date, INDECS still has not paid Claim Doc the balance due.

91.     As a result of INDECS' failure to pay Claim Doc for services rendered, Claim Doc has suffered a loss in the amount of at least $114,432.46.

**Count II**
(Breach of Contract Against INDECS)

92.     Defendant hereby incorporates by reference each and every allegation in the Counterclaim as though the same were fully set forth herein.

93.     Claim Doc, INDECS, and Wirerope entered into the Joinder Agreement, which is a valid contract supported by law.

94.     The Joinder Agreement incorporates the terms and conditions of the Agreement, including the provisions regarding Compensation and Rights and Duties Upon Termination.  Ex. A at ¶¶8, 10; Ex. B at ¶1.

95.     During the 2015-16 benefit plan year, Claim Doc provided to INDECS and Wirerope the Claim Review Services referenced in the Joinder Agreement.

96.     INDECS did not pay all fees due and owing under the Joinder Agreement.

97.     As a result of INDECS' failure to pay Claim Doc for services rendered, Claim Doc has suffered a loss in the amount of at least $114,432.46

**Count III**
(Breach of Contract Against Wirerope)

98.     Defendant hereby incorporates by reference each and every allegation in the Counterclaim as though the same were fully set forth herein.

99.     Claim Doc, INDECS, and Wirerope entered into the Joinder Agreement, which is a valid contract supported by law.

100.    The Joinder Agreement incorporates the terms and conditions of the Agreement, including the provisions regarding Compensation and Rights and Duties Upon Termination.  Ex. A at ¶¶8, 10; Ex. B at ¶1.

101.    The Joinder Agreement requires that in the event that INDECS fails to forward to Claim Doc compensation or other payments due in connection with the Joinder Agreement or the Agreement in a timely manner, upon notice to Wirerope by Claim Doc, Wirerope shall make direct payments to Claim Doc for any unpaid amounts or future payments due.  Ex B at ¶6.

102.     During the 2015-16 benefit plan year, Claim Doc provided to INDECS and Wirerope the Claim Review Services outlined in the Agreement.

103.     INDECS has withheld from Claim Doc compensation for services performed during the 2015-16 benefit plan year.

104.     Claim Doc provided Wirerope with notice that, as a result of INDECS' refusal to pay for the services rendered, Wirerope must pay Claim Doc directly.  Ex. E.

105.     To date, Wirerope has not paid Claim Doc the balance due.

106.     As a result of Wirerope's failure to compensate Claim Doc for services rendered, Claim Doc has suffered a loss in the amount of at least $114,432.46.

**Count IV**
(Tortious Interference with Contract Against INDECS and Wirerope)

107.     Defendant hereby incorporates by reference each and every allegation in the Counterclaim as though the same were fully set forth herein.

108.     Claim Doc and Needham executed a legally binding Settlement Agreement that prohibited Needham from having contact with Wirerope for the purpose of convincing it to alter or terminate its relationship with Claim Doc during the period when Claim Doc was making payments under the Settlement Agreement.

109.     On information and belief, at all relevant times, INDECS and Wirerope were aware of the existence of the Settlement Agreement and its prohibition on Needham having contact with Wirerope for the purpose of convincing it to alter or terminate its relationship with Claim Doc while Claim Doc was making payments under the Settlement Agreement.

110.    INDECS and Wirerope intentionally and maliciously interfered with the Settlement Agreement by, during the period when Claim Doc was making payments under the Settlement Agreement, communicating with Needham for the purpose of discussing and encouraging the termination of Wirerope's relationship with Claim Doc.

111.    For example, the Proposal to move Wirerope's business from Claim Doc to Claim Watcher is precisely the sort of indirect contact forbidden by the Settlement Agreement.

112.    Nonetheless, Mike Shine of INDECS knowingly and intentionally acted as a conduit for Claim Watcher and David Fishbone to induce Wirerope to move its business away from Claim Doc.

113.    INDECS' and Wirerope's interference with the Settlement Agreement has resulted in damage to Claim Doc, including but not limited to the lost value of the Wirerope account.

### Count V
(Civil Conspiracy Against INDECS and Wirerope Works)

114.    Defendant hereby incorporates by reference each and every allegation in the Counterclaim as though the same were fully set forth herein.

115.    INDECS and Wirerope were aware of the existence of the Settlement Agreement and its prohibition on Needham having contact with Wirerope for the purpose of convincing it to alter or terminate its relationship with Claim Doc while Claim Doc was making payments under the Settlement Agreement.

116.    Nonetheless, while Claim Doc was making payments under the Settlement Agreement, INDECS and Wirerope agreed to work with Needham to replace Claim Doc with Claim Watcher.

117.    While Claim Doc was making payments under the Settlement Agreement, INDECS and Wirerope communicated with Needham for the purposes of discussing terminating Wirerope's relationship with Claim Doc, and replacing Claim Doc with Claim Watcher.

118.    INDECS and Wirerope shared the objective of tortiously interfering with the Settlement Agreement.

119.    As a result of INDECS' and Wirerope's conduct, Defendant has incurred damages, including but not limited to the lost value of the Wirerope account.

### Count VI
(Quantum Meruit/Unjust Enrichment Against Wirerope Works)

120.    Defendant hereby incorporates by reference each and every allegation in the Counterclaim as though the same were fully set forth herein.

121.    BCR assigned to Claim Doc any damages claim that BCR may have against Wirerope arising out of design and setup services for the 2016-17 benefit plan year.

122.    BCR designed for Wirerope a health benefits program for the 2016-17 year.  In so doing, BCR performed all of the work for the plan setup for the year, such as gathering all data necessary for renewal quotes for stop loss.

123.    BCR reasonably expected to receive payment for its design and setup of Wirerope's 2016-17 health benefits plan through Wirerope's payment of monthly fees throughout the plan year, as required by the proposal BCR presented to Wirerope, and as had occurred during the prior two plan years.

124.    Wirerope terminated its relationship with BCR prior to the start of the 2016-17 plan year.

125.    Nonetheless, Wirerope implemented almost the entire health benefits program that BCR designed for Wirerope for the 2016-17 plan year.

126.    For the 2017-2018 plan year, Wirerope again implemented almost the entire health benefits program that BCR designed for Wirerope.

127.    To date, Wirerope has not compensated BCR in any way for the design and setup of the plan.

128.    It would be inequitable to allow Wirerope to use the benefits plan that BCR designed and negotiated without compensating BCR for its services.

**WHEREFORE**, Counterclaim Plaintiff Claim Doc, LLC prays for judgment as follows:

(a)    Dismissing the Complaint in its entirety with prejudice;

(b)    Awarding damages on the counterclaims in an amount to be determined at trial;

(c)    Awarding Claim Doc its attorney's fees and expenses; and

(d)    Awarding such other and further relief to Claim Doc, LLC as this Court deems just and proper.

Respectfully submitted,

_____ s/ *Lisa J. Rodriguez* _____
Lisa J. Rodriguez, Esq.
Courtney Devon Taylor, Esq.
SCHNADER HARRISON SEGAL & LEWIS LLP
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002-1165
Telephone: (856) 482-5741
Facsimile:  (856) 482-6980
lrodriguez@schnader.com
ctaylor@schnader.com

David Smith, Esq.
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Telephone: (215) 751-2000
Facsimile:  (215) 751-2205
dsmith@schnader.com


*Attorneys for Defendant/Counterclaim Plaintiff*
*Claim Doc, LLC*

Dated:  February 11, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2019, true and correct copies of the foregoing Amended Counterclaim were filed with the Court via CM/ECF. Copies of the foregoing also were served upon plaintiffs/counterclaim defendants via ECF.

      *s/ Lisa J. Rodriguez*

Lisa J. Rodriguez, Esq.
Courtney Devon Taylor, Esq.
SCHNADER HARRISON SEGAL & LEWIS LLP
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002-1165
Telephone: (856) 482-5741
Facsimile: (856) 482-6980
lrodriguez@schnader.com
ctaylor@schnader.com

# EXHIBIT A

## Agreement for Claims Review, Audit, and Negotiation Services

**AGREEMENT** by and between **INDECS Corporation**, ("INDECS") a Delaware Corporation having a place of business at 1099 Wall Street West, Suite 317, Lyndhurst, NJ 07071 and **Claim Doc, LLC**, ("CD"), a Limited Liability Company having its principal place of business at 100 SW Albany Avenue, Suite 110, Stuart, FL 34994 (collectively, the "Parties" and individually, "Party").

**WHEREAS**, INDECS is engaged in the business of providing claims management and administration services ("Claims Services") to INDECS's customers in addition to which Customer may require or desire various review, auditing, and negotiating services of medical and pharmacy claims ("Claim Review Services") incurred by self-funded ERISA and non-ERISA health plans ("Plan(s)"); and

**WHEREAS**, CD is in the business of providing such Claim Review Services; and in order to provide such Claims Review Services to a INDECS customer, the customer shall be required to enter into a Joinder Agreement ("Joinder Agreement") with the Parties hereto; and

**WHEREAS**, CD desires to accept such engagement pursuant to the terms and conditions of this Agreement and the Joinder Agreement;

**NOW, THEREFORE**, in consideration of the terms, conditions and other agreements set forth herein, INDECS and CD hereby agree as outlined below:

1.  **Scope of Work.** CD will upon INDECS's written request perform Claim Review Services for claims for medical and pharmacy services incurred by members covered by selected Plans for whom INDECS is acting as the Third Party Administrator ("Covered Members"). CD may subcontract all or a portion of the Claim Review Services to an outside vendor such as an outside Medical Management Company ("MMC"), or an Independent Review Organization ("IRO") if requested by a covered member or a provider at its sole discretion, so long as the use of an MMC or IRO is authorized by the Plan Document and the fees are covered by the stop loss policy covering the Plan. In providing such Claim Review Services, CD shall:

    a.  utilize the Plan Document adopted by the Plan (provided that the Plan Document contains the appropriate language required by CD, to implement and operate the Claim Review Services, and the stop loss policies covering the Plan as the basis for the claim review and audit determinations to assist INDECS in determining the appropriate reimbursement amount for claims by the Plan, and for stop loss claims under the appropriate stop loss policy covering the Plan;

    b.  provide INDECS with a written audit report for each claim submitted for audit and review along with appropriate legal and other references to support the determination;

    c.  provide appropriate language to be utilized by the Plan in the Explanation of Payment and Explanation of Benefits to the provider and member in connection with a claim, as well as the appropriate Notice of Adverse Benefit Determination and First Notice to Patient concerning the claim determination, the appeals process, and procedures to be followed if a provider does not accept the reimbursement for the claim as determined by the audit;

   d.  on becoming aware of any compliance or other legal issues during the review, advise INDECS and make recommendations to properly address any issues or problems;

   e.  if provided for in the Plan Document, handle appeals filed by providers or members of audit determinations in accordance with the Plan's appeal provisions and arrange for and provide at no cost to the Plan or patient a legal defense against non-patient responsibility in balance bills. If legal defense is not provided for in the Plan Document, then CD will use commercially reasonable efforts to negotiate and settle at its sole discretion, any balance bill attempts with providers on behalf of the Plan and/or Patient; and

   f.  if authorized by the Plan Document, negotiate direct contracts for access to providers and make those contracts available to the Plans and Covered Members to determine the appropriate payment for Covered Services.

The Parties have agreed to utilize a workflow in connection with the Claims Review Services as set forth on Exhibit A, Data Submission Requirements, Exhibit B, Claim Doc Workflow Process, Exhibit C, FTP Folder Layout, which is attached to and made a part of this Agreement.

Prior to start of an engagement to provide Claim Review Services for a specific Plan Sponsor and/or Plan Administrator, INDECS and Plan Sponsor shall enter into an agreement ("Joinder Agreement") substantially in the form of Exhibit D attached hereto and made a part hereof.

In performing its duties hereunder, CD shall be acting as a fiduciary of the Plan and shall adhere to the applicable standards of conduct, which are set forth in 29 U.S.C. § 1104(a)(1)(A), (B) and (D). CD in its sole discretion, will determine eligible candidates from among the claims submitted, and select certain claims for audit under the guidelines for Allowable Claim Limits to which the Plan has agreed. CD shall use its best efforts to perform its duties hereunder within the compliance time limits set forth in the DOL Claim Processing Regulations.

CD represents and warrants that it and its subcontractors shall possess the requisite education, skills, and experience to provide Claim Review Services. Use by CD of subcontractors shall not relieve CD of any of its obligations to INDECS under this Agreement.

2.   **Defined Terms.** Capitalized terms, which are not otherwise defined in this Agreement shall have the meanings set forth in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or in the Exhibit(s) which are attached hereto and made a part hereof. As used herein, the following terms shall be defined as follows:

"Allowable Claim Limit" shall have the meaning set forth in the Plan Documents.

"INDECS Customer" or "Customer" shall mean the "Plan", the "Plan Administrator", and the "Plan Sponsor", and wherever any such terms are used individually or together in this Agreement or in the Joinder Agreement it shall mean all of them jointly.

"Damages" shall mean (i) all attorneys' fees incurred by CD in connection with a Referred Appeal; (ii) all attorneys' fees incurred by the Plan Sponsor, the Plan Administrator and/or the Plan in connection with a Referred Appeal, if such attorneys are designated by CD; (iii) all other fees, costs and expenses resulting from the investigation, adjudication, and defense (including any appeal) of a Referred Appeal

incurred by CD or, with prior written consent of CD, by the Plan Sponsor, Plan Administrator and/or the Plan; (iv) any restitutionary damages finally awarded to a participant; and (v) any attorneys' fees and costs incurred by the participant if such fees and costs are to be paid by the Plan Sponsor, the Plan Administrator, the Plan and/or CD. "Damages" shall not mean sanctions; fines; penalties; taxes; multiple, exemplary or punitive damages; or the amount of any Health Benefit Claim unless CD elects to pay all or a portion of a Health Benefit Claim itself, as part of a settlement in accordance with this Agreement. "Damages" for payment in settlement of a Health Benefit Claim shall be limited to the amount of the Health Benefit Claim to the extent that the payment in settlement exceeds the lesser of (i) the amount of the original benefit determination by CD, or (ii) the amount of the "payable charges."

"Payable charges" shall mean the billed charges that are payable by the Plan minus any PPO or other managed-care discount(s) that are contractually available to the Plan.

"Referred Appeal" shall mean any appeal of a denied Health Benefit Claim under the Plan, which shall be referred to CD by the Plan Administrator after audit under this Agreement by CD. "Referred Appeal" shall not mean any appeals of Pre-service Urgent Care Claims (as defined in 29 C.F.R. § 2560.503-1 (the "DOL Claims Processing Regulations")), which shall be the sole responsibility of the Plan Administrator and any other person or entity to whom it may delegate such responsibility.

"Health Benefit Claim" shall mean a claim for benefits filed by a participant in the Plan, where the request for approval of treatment or services or the rendering of services or supplies occurred during a Plan Year or calendar year applicable under the term of this Agreement. "Health Benefit Claim" shall not mean any Pre-service Urgent Care Claims.

As respects the "Limit of Liability" applicable to Damages, it shall mean an amount equal to One Million Dollars ($1,000,000) per Referred Health Benefit Claim or Appeal.

"Third Party Administrator" shall mean INDECS who is currently engaged by the Plan Administrator to provide certain claims processing and other ministerial services to the Plan at the time of the request for approval of services or the rendering of services that comprises a Health Benefit Claim.

"Plan Documents" shall mean the documents establishing and governing, and setting forth the benefits of, the Plan, including the plan document and the Summary Plan Description or, in the event of a Health Benefit Claim arising prior to the effective date of the Plan Documents, the Plan Documents in effect at that prior time.

3.     **Amount of Liability.** CD shall be responsible for all Damages; provided, however, that CD's liability for Damages is limited to the Limit of Liability. The Parties agree that responsibility for any Damages in excess of the Limit of Liability shall be that of the Plan Sponsor, the Plan Administrator and/or the Plan.

4.     **Exclusions.** CD shall not be liable for any Damages incurred by the Plan Sponsor, the Plan Administrator and/or the Plan in connection with any Referred Appeal, if and to the extent that such Damages are (a) the result of negligence or willful misconduct by the Plan Sponsor or the Plan Administrator or the Third Party Administrator in performing its duties under this Agreement, including those set forth on Exhibit A; (b) the result of language in the Plan Documents which is not in compliance

with applicable law or which otherwise is unenforceable; or (c) the result of the Plan Sponsor's failure to provide timely funding necessary to pay a Health Benefit Claim as approved by CD.

5.      **Notification.** The Plan Sponsor and/or the Plan Administrator shall notify CD in writing, of the commencement of any litigation relating to a Referred Appeal or the occurrence of any event which might give rise to liability under this section promptly following such Commencement or occurrence. In the event the Plan Sponsor and/or the Plan Administrator does not provide such timely written notice which prejudices CD's rights or obligations under this Agreement, then CD may have no or limited responsibility in connection with such litigation or event. An occurrence, as used in this section, shall refer to a service of complaint, writ of summons, or letter of representation from an attorney for a plan participant or medical provider.

6.      **Indemnity.** Without in anyway limiting CD's obligations under this Agreement including it responsibility for Damages under Section 3 herein, CD shall hold harmless, indemnify, and defend INDECS against any and all losses, claims, expenses (including reasonable attorneys' fees), sanctions, fines, penalties, taxes, damages including, but not limited to, multiple, exemplary or punitive damages, judgments or liabilities whatsoever ("Liabilities") except to the extent such Liabilities are caused by INDECS's breach of this Agreement or its fraud, negligence or willful misconduct with respect to its obligations under this Agreement.

7.      **Insurance.** CD represents and warrants that it has and agrees that it will maintain at all times for the duration of the Agreement and a period of two (2) years thereafter, the required insurance coverages and limits and all other terms and conditions required pursuant to <u>Exhibit E</u>.

8.      **Compensation:** CD shall receive a fee ("Services Fee"), as compensation for services provided hereunder, an amount equal to 12% of the first $100,000 of "billed charges" for a claim for which CD has performed services hereunder and 10% of the excess over $100,000 of billed charges for such claim. "Billed charges" are the total billed charges billed for the claim prior to any discounts or other reductions. In the event CD enters into direct contracts use to determine the payment amount for a claim, then CD's fees shall be 7% of the Billed Charges paid utilizing the contractual discounts. INDECS on behalf of Plan Sponsor and itself acknowledges that CD may hire a third party expert on behalf of the Plan to audit claims to identify expenses that are not within Plan Limits. CD agrees to pay for fees and costs for services rendered by such experts or services and for legal defense; if applicable. INDECS on behalf of and with the funds provided by the Plan Sponsor agrees to pay CD the Services Fee under this Section at the same time that INDECS, on behalf of the Plan, makes payment for the underlying medical or pharmacy claim, or, if no benefits are found to be payable for the claim according to the terms of the Plan, at the time of adjudication of the claim by INDECS , for which CD has performed services hereunder.

9.      **Plan Sponsor and/or Plan Administrator Disagreement.** With respect to determinations of Referred Appeals under Section 1 above, in the event the Plan Administrator does not agree with CD's determination regarding a Referred Appeal and elects to override such determination, then all obligations of CD under this Agreement with respect to such Referred Appeal may terminate. More specifically, CD may have no obligation to indemnify or hold the Plan, the Plan Sponsor and/or the Plan Administrator harmless with respect to such Referred Appeal. Plan Sponsor and Plan

Administrator shall be fully responsible with respect to the outcome of any litigation related to the Referred Appeal.

With respect to Settlement Authority under Section 1 above, in the event that the Plan Sponsor and/or the Plan Administrator does not agree with the terms of any such settlement and elects not to accept CD's recommendation for a settlement of a claim, then the Plan Sponsor shall be responsible for Damages with respect to the Referred Appeal that are in excess of the settlement amount proposed by CD in addition to the difference between the Allowable Claim Limits and the Settlement Amount, including the cost of litigation and any judgment.

10.    **Term and Termination.** The initial term of this Agreement shall be one (1) year, beginning on June 1, 2015, through May 31, 2016, or as otherwise set forth in this Section 10.  This Agreement shall renew itself automatically for additional one-year periods of time, unless and until terminated by either Party in accordance with the provisions of this Section 10.  This Agreement shall terminate as follows:

   a.  **By Either Party with Notice.** Either Party to this Agreement may terminate it by giving sixty (60) days' prior written notice thereof to the other Party.

   b.  **By CD Upon Failure to Pay Fees.** If INDECS and/or a Plan Sponsor does not pay the fees set forth in Section 8 within ten (10) business days of the due date, CD may resign upon giving five (5) business days prior written notice and this Agreement shall immediately terminate.

**Rights and Duties Upon Termination.** As of the date of termination of this Agreement and the expiration of any run out period under any applicable Stop Loss Policy, all rights and obligations of the Parties shall terminate, except that (a) CD shall continue to perform its obligations under this Agreement with respect to any Referred Health Benefit Claim or Appeal of a Health Benefit Claim provided that the Plan Document continues to name the TPA or the Plan Administrator as a designated decision maker with maximum discretionary authority with respect to such Referred Appeals; and (b) INDECS, shall pay on behalf of and with funds provided by the Plan Sponsors, all fees which are due and owing under this Agreement as of the date of termination.

11.    Confidentiality.  Either Party to this Agreement may, in the course of fulfilling its terms, need to disclose information to the other Party that is proprietary or confidential.  When such disclosure is undertaken, the following provisions apply:

   a.  The term "Disclosing Party," as used in this Agreement, means the party providing Confidential Information.  The "Receiving Party" is the party receiving the Confidential Information.

   b.  The term "Confidential Information," as used in this Agreement, means any oral, written, or documentary information or information that is stored by electronic means which (i) relates to this Agreement, (ii) is received by one of the Parties from the other, and, in the case of written information, (iii) is may be marked "Confidential," "Proprietary" or bear a marking of like import or which the Disclosing Party states in writing at the time of

transmittal to, or receipt by, the Receiving Party is to be considered confidential. The language provided by CD in connection with the Claim Review Services for Plan Documents, Letters, Audit Reports, EOBs, EOPs, NOABDs, and appeals determinations that may be communicated by CD to Plan Sponsor and/or Plan Administrator as part of this Agreement are all Confidential Information and may not be used by Plan Sponsor or Plan Administrator for any other purpose whether before or after a termination of this Agreement.

c. The Parties acknowledge and agree that some of the documentation, benefit information, medical information and records that are shared with CD in connection with its services may contain personal healthcare information that is protected under the Health Insurance Portability and Accountability Act (HIPAA). The Parties are aware of the requirements to safeguard protect and to maintain the confidentiality and privacy of this information and have executed a separate Business Associates Agreement to comply with any such requirements, a copy of which is attached hereto.

12.   **Governing Law / Disputes.** This Agreement shall be construed and governed by the Laws of the State of New Jersey without regard to conflicts of law. Disputes shall be negotiated in good faith for thirty (30) days. Unresolved disputes shall be submitted to non-binding mediation.

13.   **Notices.** All notices hereunder shall be in writing and shall be sent via personal delivery, courier service, United States mail (postage pre-paid, return receipt requested), express mail courier, electronic mail, or fax and addressed as follows, or to such other individual or address as a party may later direct:

INDECS INDECS Corporation
    1099 Wall Street West, Suite 317
    Lyndhurst, NJ 07071
    Attn: Mike Shine, CEO
    Fax: 201-460-3246

CD  Claim Doc, LLC
    100 SW Albany Avenue, Suite 110
    Stuart, FL 34994
    Attn: Del Lockett, President

If the notice relates to a legal matter or dispute, a copy shall be sent to:

INDECS INDECS Corporation
    1099 Wall Street West, Suite 317
    Lyndhurst, NJ 07071
    Attn.: General Counsel's Office

14.   **General**

a. This Agreement constitutes the entire agreement of the Parties and supersedes all previous agreements and/or contracts whether oral or written between them with respect to the subject matter hereof.

b. If any provision of this Agreement shall contravene or be invalid under the laws of the United States, the state in which enforcement is sought, or the regulatory requirements

of such state, it is agreed that such provision shall not invalidate the whole Agreement but the Agreement shall be construed as if not containing the particular provision or provisions held to be invalid.

c. This Agreement may only be amended by a written instrument signed by the Parties hereto.

d. The Parties shall not disclose to any third party the terms and conditions of this Agreement, except as may be required by law, reasonable advice of its counsel, or the written consent of the non-disclosing Party. Notwithstanding the aforementioned, this Agreement may be disclosed to the Plan Sponsor and/or Plan Administrator, and the Parties' representatives, accountants, attorneys, and advisors.

e. This Agreement shall be binding upon and inure to the benefit of the Parties hereto, their successors and assigns. A Party may not assign this Agreement or the services required herein without the prior written consent of the other Party, which shall not be unreasonably withheld or delayed, except that INDECS may assign this Agreement to an affiliate or subsidiary company, or a successor in interest by acquisition or merger provided that such succeeding company shall assume all rights and obligations under this Agreement.

f. Except as otherwise provided herein, nothing in this Agreement is intended or shall be construed to give any person, other than the Parties hereto and the Plan Sponsor and/or Plan Administrator, their respective successors and permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

g. A Party hereto shall not be deemed to have waived any rights or remedies accruing to it hereunder unless such waiver is in writing and signed by such party. No delay or omission by a Party hereto in exercising any right shall operate as a waiver of said right on any further occasion.

h. Wherever approval of a Party is required under this Agreement, it shall not be unreasonably withheld or delayed.

i. The captions are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Agreement.

j. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by e-mail transmission shall constitute effective execution and delivery of this Agreement and may be used in lieu of the original for all purposes. Signatures of the Parties transmitted by e-mail shall be deemed to be their original signatures for all purposes.

k. Each Party represents to the other that it is authorized to enter into this Agreement and that its entry into this Agreement does not and will not violate the terms of any judgment, decree or ruling or any contract with any third party.

l. The provisions of Sections 3, 4, 5, 6, 7, 8 and 11, shall survive indefinitely the expiration or sooner termination of this Agreement.

INDECS AND CD CERTIFY BY THEIR UNDERSIGNED AUTHORIZED OFFICERS THAT
THEY HAVE READ THIS AGREEMENT, INCLUDING ALL SCHEDULES AND EXHIBITS
HERETO, AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS.

| The INDECS | Sur Claim Doc, LLC |
|---|---|
| *Michael Shine* | J. Del Lockett |
| Printed Name | Printed Name |
| Chief Executive Officer    6-1-15 | President        06/01/2015 |
| Title        Date | Title        Date |

## Exhibit E
## Insurance Requirements

1. **Required Coverages**

CD shall maintain the following insurance coverages:

A. General Liability Insurance, including Contractual Liability, in the amount of at least One Million Dollars ($1,000,000) per occurrence; and

B. Professional Liability Insurance, providing coverage necessary to insure against claims for damages arising out of or by reason of any acts or omissions directly or indirectly in connection with services provided hereunder. Coverage will be in an amount not less than One Million Dollars ($1,000,000) per occurrence; and

C. Privacy/Network Security (Cyber) liability coverage providing protection against liability for (1) privacy breaches [Liability arising from the loss or disclosure of confidential information including Personal Health Information, no matter how it occurs]; (2) system breach; (3) denial or loss of service; (4) introduction, implantation, or spread of malicious software code; (5) unauthorized access to or use of computer systems with limits of One Million dollars ($1,000,000). No exclusion/restriction for unencrypted portable devices/media may be on the policy. Because CD does not maintain its own servers or systems and no confidential information of any kind is maintained by CD in its offices, systems, computers, or otherwise, but rather CD contracts with outside vendors for such services including secure email, CD may rely on the Privacy/Network Security Cyber liability insurance provided by the vendors, so long as these policies comply with the provisions of this paragraph.

2. **Other Provisions**

A. **Additional Insured.** INDECS, including its officers, directors, and employees, shall be named as additional insureds by endorsement to the General Liability, Privacy/Network (Cyber) Liability coverages listed herein with regard to the CD's activities under this Agreement. The coverage shall contain no special limitations on the scope of protection afforded to INDECS.

B. **Coverage Continuation and Cancellation.** In the event any insurance policy shown on the certificate(s) of insurance has an expiration date prior to the completion of the Agreement, the CD shall furnish INDECS proof of identical continued coverage prior to the expiration date shown on the certificate. Failure to maintain continuous coverage during the term of the Agreement and for a period of two (2) years thereafter, or failure to provide proof of coverage at any time during the term of the Agreement for a period of two (2) years thereafter, may result in cessation of work and/or termination of the Agreement. Coverage shall not be canceled, non-renewed, except after thirty (30) days prior written notice.

C. **Subrogation.** CD must waive all rights of subrogation against INDECS for any loss arising from work performed by CD.

D. On or before the Effective Date, CD must submit to INDECS proof of all insurance coverages required by this Agreement. Such proof shall be furnished to INDECS on the ACORD certificate form, provided the appropriate endorsements for Additional Insured and Amendment of Cancellation with 30-day notice are included.

E. INDECS reserves the right to request a complete copy of all required insurance policies at any time.

# EXHIBIT B

# JOINDER AGREEMENT

AMONG

## CLAIM DOC, LLC

515-850-5025


AND

## INDECS CORPORATION

1099 Wall Street West, Unit 317
Lyndhurst, NJ 07071


AND

## WIREROPE WORKS, INC.

100 MAYNARD RD.
WILLIAMSPORT, PA 17701

CD 0000778

## JOINDER AGREEMENT

This Agreement, effective June 1, 2015, by and among Wirerope Works, INC. (hereinafter referred to as "Plan Sponsor"), INDECS Corporation ("INDECS") a Delaware corporation having a place of business at 1099 Wall Street West, Suite 317, Lyndhurst, NJ 07071, and Claim Doc, LLC ("CD"), a Limited Liability Company with an office at 100 SW Albany Avenue, Suite 110, Stuart, FL 34994.

WHEREAS, Plan Sponsor has adopted a health benefit plan ("Health Plan" or "Plan") for its employees and their eligible dependents under which such persons are entitled to certain health service benefits ("Covered Services"); A copy of the Plan is attached hereto as Exhibit A.

WHEREAS, Plan Sponsor is a customer of INDECS which provides claims administrative services to Plan Sponsor in connection with its Health Plan(s);

WHEREAS, INDECS has entered into an agreement with CD titled "Agreement for Claims Review, Audit and Negotiation Services dated as of June 1, 2015 ("Services Agreement") whereby CD will offer Claim Review Services, as such services are defined therein to INDECS's customers subject to the terms and conditions therein and in this Agreement

WHEREAS, for purposes of this Agreement, wherever the term "Plan Sponsor" is used, it shall include Plan Sponsor, Plan Administrator, the Plan, and customer; and wherever any such terms are used individually or together in this Agreement or the Services Agreement it shall mean all of them jointly.

WHEREA3, Plan Sponsor desires to have access to CD's Claims Review Services for its Health Plan and

NOW THEREFORE, in consideration of the promises and mutual covenants contained herein, it is hereby agreed as follows:

1.      Plan Sponsor acknowledges and agrees that the terms and conditions of the Services Agreement between INDECS and CD, attached hereto as Exhibit B are incorporated into this Agreement and made part hereof, and Plan Sponsor shall perform and be bound by the obligations of the Plan Sponsor, Plan Administrator, or Plan stated therein. The Plan Sponsor agrees to the engagement of CD to perform the Claims Review Services. Plan Sponsor hereby authorizes CD to be a co-fiduciary as respects all determinations made by CD for claims subject to the Service Agreement. Plan Sponsor has been issued Stop Loss Coverage to cover Plan Sponsor in connection with its Health Plan.

2.      Plan Sponsor agrees that INDECS is authorized to represent Plan Sponsor for the purposes of obtaining Claims Review Services from CD.

3.      Plan Sponsor acknowledges that it is responsible for the payment of any PPO access fee, if any, and such amounts as may be due to Providers for medical and pharmacy claims for Covered Services rendered to its Health Plan participants. Plan Sponsor further acknowledges that it has arranged for processing payments for Covered Services to Providers through its agreement with INDECS. INDECS is not the insurer, guarantor, or underwriter of the liability of the Plan Sponsor to provide such benefits to its Health Plan participants or to pay Providers. Plan Sponsor acknowledges that if it is unable to provide sufficient funds to process payments due to Providers, then Plan Sponsor shall notify INDECS prior to the Provider's payment due date. In the event of a Plan Sponsor's failure to pay any sums due for Claims Review Services hereunder within 10 days of the due date, Plan Sponsor shall notify INDECS of such event, and access by

1

CD 0000779

Plan Sponsor's Health Plan participants to the Claims Review Services hereunder shall immediately terminate.

4.    Independent Contractors.  The relationship between Plan Sponsor, INDECS and CD is an independent contractor relationship.  None of the provisions of this Agreement are intended to create nor not shall be deemed or construed to create any relationship between CD, INDECS, and Plan Sponsor other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of the Agreement.  None of the parties herein, nor any of their respective employees shall be construed to be the agent, employer or representative of either or both of the others, except to the extent otherwise explicitly provided for herein or under the Services Agreement.

5.    Plan Sponsor represents and warrants that it is liable for all amounts due CD under the Services Agreement and this Agreement and that it is solvent and financially able to pay all such amounts.  Plan Sponsor represents and warrants that it has sufficient funds on hand to pay all amounts that it reasonably anticipates will accrue over the three-month period that follows the execution of this Agreement and that at any point during the term of this Agreement it shall have a reserve fund sufficient to pay all amounts that it reasonably can anticipate will accrue during the three-month period which follows.

6.    Plan Sponsor also agrees that in the event INDECS fails to forward to CD compensation or other payments due hereunder in connection with this Agreement and/or the Services Agreement in a timely manner, upon notice to Plan Sponsor by CD, Plan Sponsor shall make direct payments to CD for any unpaid amounts or future payments due under this Agreement, whereupon INDECS shall be relieved of any liability therefor.

7.    Plan Sponsor acknowledges and agrees that it shall indemnify, hold harmless, and defend INDECS and CD against any and all  Damages as that term is defined in the Services Agreement to which INDECS or CD may be subject, in excess of what CD is liable for under the Service Agreement.  Furthermore, without limiting the generality of the foregoing, Plan Sponsor shall indemnify and hold INDECS and CD harmless against any liability arising out of or related to any act or omission of INDECS or CD taken or omitted to be taken at the request, direction, or approval of the Plan Sponsor.

8.    In the event the Client Services Agreement between Plan Sponsor and INDECS terminates prior to the expiration of the current plan year of Plan Sponsor's Health Plan and any run out period under the applicable Stop Loss Policy, and Plan Sponsor or INDECS on behalf of Plan Sponsor so requests in writing, CD shall continue to provide services to Plan Sponsor's Health Plan until the end of the current plan year and the run out period, so long as payments due under this Agreement are made when due.  This Agreement shall survive the termination of the Client Services Agreement between INDECS and Plan Sponsor until the end of the current plan year, after such termination and the end of any applicable Stop Loss Run Out Period.

9.    All notices hereunder shall be in writing and shall be sent via personal delivery, courier service, United States mail (postage pre-paid, return receipt requested), express mail courier, electronic mail, or fax and addressed as follows, or to such other individual or address as a party may later direct:

    Plan Sponsor     Wirerope Works, INC.
                     100 Maynard Rd.
                     Williamsport, PA 17701
                     Attn: Harold Kropp

3

INDECS INDECS Benefit Administrators, Inc.
  1099 Wall Street West, Suite 317
  Lyndhurst, NJ 07071
  Attn: Mike Shine, CEO
  Fax: 201-460-3246

CD  Claim Doc, LLC
  150 SW Albany Avenue, Suite 110
  Stuart, FL 34994
  Attn: Del Lockett, President

If the notice relates to a legal matter or dispute, a copy shall be sent to:

Plan Sponsor Wirerope Works, INC.
  100 Maynard Rd.
  Williamsport, PA 17701

INDECS INDECS Insurance Group
  1099 Wall Street West, Suite 317
  Lyndhurst, NJ 07071
  Attn.: General Counsel's Office

13. General.

 a. This Agreement and the rights and obligations set forth herein may not be assigned by a party without the prior written consent of the other parties.

 b. The recitals are incorporated into this Agreement and made a part hereof.

 c. This Agreement may be executed in three or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by e-mail transmission shall constitute effective execution and delivery of this Agreement and may be used in lieu of the original for all purposes. Signatures of the Parties transmitted by e-mail shall be deemed to be their original signatures for all purposes.

 d. Each party represents to the others that it is authorized to enter into this Agreement and that its entry into this Agreement does not and will not violate the terms of any judgment, decree or ruling or any contract with any third party.

 e. The provisions of Sections 1,3,5,6,7&8- shall survive the expiration or sooner termination of this Agreement and/or the Services Agreement.

4

CD 0000781

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers, this 1st day of June, 2015.

PLAN SPONSOR
For Wirerope Works. INC.
100 Maynard Rd.
Williamsport, PA 17701

BY: _Harold Kipp_

Title: _CFO_

Date: _7/15/15_

For JNDES Corp.
1099 Wall Street West Suite 317
Lyndhurst, NJ 07071

Name: _Michael P. Shine_

Title: _CEO_

Signature: _____

Date: _7/15/15_

For Claim DOC, LLC
100 SW Albany Avenue, Suite 110
Stuart, Florida 34994

Name: _J. Del Lockett_

Title: _President_

Signature: _____

Date: _06/01/2015_

6

CD 0000782

# EXHIBIT C

 ClaimDOC

Claim-Doc, LLC
110 SW Albany Ave, Suite 210
Stuart, Florida 34994
www.claim-doc.com
888-330-7295

May 11, 2016

INDECS Corporation
Attn: Mike Shine, CEO
1099 Wall Street West, Suite 317
Lyndhurst, NJ 07071

RE: Claim DOC Intent to Terminate

Dear Mike:

This letter is to notify you pursuant to Paragraph 10(a) of the Claim DOC – INDECS Service Agreement ("Agreement for Claims Review, Audit, and Negotiation Services") of Claim DOC's intent to terminate this Agreement and election not to renew.  Thus, this Agreement will terminate sixty-days from the date of this letter, July 2, 2016.

It has been a pleasure working with INDECS and we wish you the best of luck in the future.

Sincerely,

Ben Krambeck, CEO
Claim DOC, LLC
100 SW Albany Ave, Suite 200
Stuart, FL 34994

# EXHIBIT D



Claim-Doc, LLC
110 SW Albany Ave Suite 210
Stuart, Florida 34994
www.claim-doc.com
888-330-7295

May 11, 2016

Wirerope Works, Inc.
Attn: Harold C. Kropp, Jr.
100 Maynard Street
Williamsport, PA 17701

RE: Claim DOC Intent to Terminate

Dear Harold:

Yesterday you notified me of your intention not to renew the Wirerope Work's health benefit plan with BCR for the upcoming plan year. Although we are disappointed to lose your loyal business, we wish you the best of luck in the future.

Pursuant to a separate Joinder Agreement, you had also contracted with Claim DOC, LLC for its claim audit and review services. This letter is to notify you pursuant to Paragraph 10(a) of the Claim DOC – INDECS Service Agreement ("Agreement for Claims Review, Audit, and Negotiation Services") and the associated Claim DOC-INDECS-Wirerope Works Joinder Agreement of Claim DOC's intent to terminate this Agreement and election not to renew. Thus, this Agreement will terminate sixty-days from the date of this letter, July 2, 2016.

The services under this Agreement will continue until July 2, 2016, including:

(1) Balance bill defense
(2) Response to Referred Appeals stemming from a Referred Health Benefit Claim
(3) Auditing services for Referred Health Benefit Claims with Dates of Service prior to July 2, 2016

Of course, any fees will be owed for these services. As previously discussed, Amy Pellegrin is working to provide you with documentation from the court system to provide to your employees affected by last year's litigation to reassure them these matters are closed. We will follow through on that promise.

After July 2, 2016, we will continue to respond to any Referred Appeals beyond the date of termination for those Claims that were audited pursuant to the Agreement, even if the Appeal itself is served on us after the date of termination. However, following July 2, 2016, pursuant to the terms of the Agreement, we will no longer provide balance bill representation or continue to

ClaimDOC

represent those members with balance bills that remain pending.  Until this time, we will assist you in attempting to resolve these matters.

Thank you for your business and best of luck to you in the future.

Sincerely,

Ben Krambeck, CEO
Claim DOC, LLC
100 SW Albany Ave, Suite 200
Stuart, FL 34994

Claim-Doc, LLC
100 SW Albany Ave, Suite 210
Stuart, Florida 34994
www.claim-doc.com
888-330-7195

5/11/2016                                                                                        page 2 of 2

# EXHIBIT E

# BOCHETTO & LENTZ

ATTORNEYS AT LAW
1524 LOCUST STREET
PHILADELPHIA, PA 19102

TELEPHONE: (215) 735-3900
TELECOPIER: (215) 735-2455

FIRM WEB SITE:
bochettoandlentz.com

E-MAIL ADDRESS:
gbochetto@bochettoandlentz.com

June 30, 2016

GEORGE BOCHETTO^
GAVIN P. LENTZ
JEFFREY W. OGREN^
DAVID P. HEIM^
VINCENT van LAAR^
BRYAN R. LENTZ^
JOHN A. O'DONNELL^
PETER R. BRYANT^

ALBERT M. BELMONT, III^
THOMAS E. GROSHENS
GN CO/OUNS,

CORA J. O'DONNELL, ∂.O.
SUSAN PERRY
JANINE BAKER
JOANNE GUARALDI
MARGARET E. KAVINS
VANIA NGRAZ-NOYACEVIC
PHILADELPHIA

PRACTICE DEDICATED TO LITIGATION
AND NEGOTIATION MATTERS

NEW JERSEY OFFICE

1200 BRACE ROAD
CHERRY HILL, NEW JERSEY 08034
TELEPHONE NUMBER:
(856) 722-4555
(330) 437-0581
TELECOPIER: (856) 722-5811

* ADMITTED TO NEW JERSEY BAR
† ADMITTED TO NEW YORK BAR
^ ADMITTED TO D.C. BAR

Via Email and Certified Mail, R.R.R.

Amy Pellegrin, Esq.
Claim Doc, LLC
506 3rd Street, Second Floor
Des Moines, IA 50309

Re:   Wirerope Works, Inc., Post-Termination Obligations

Dear Ms. Pellegrin:

Our office represents INDECS, which is a party to certain agreements with Claim Doc,
LLC ("Claim Doc"). By a letter of May 11, 2016, Ben Krambeck notified INDECS that Claim
Doc would illegally refuse to honor its post-termination obligations under paragraphs 10 and 1(e)
of the Agreement for Claims Review, Audit, and Negotiation Services (the "Agreement") to
provide legal defense of post-termination balance bills. You confirmed Claim Doc's intention to
violate the Agreement by a letter of May 27, 2016, acting as the general counsel of Claim Doc.

We have reviewed these letters and the Agreement, and find that the position taken by
Claim Doc is without merit. The Agreement specifically requires that Claim Doc:

> handle appeals filed by providers or members of audit
> determinations in accordance with the Plan's appeal provisions and
> arrange for and provide at no cost to the Plan or patient a legal
> defense against non-patient responsibility in balance bills.

Agreement ¶ 1(e). The termination provision of the Agreement provides that the duty to defend
balance bills continues after termination: "CD shall continue to perform its obligations under this
Agreement with respect to any Referred Health Benefit Claim or Appeal of a Health Benefit
Claim[.]" This plain language of the contract supports the interpretation of INDECS that its duty
to defend balance bills continues. *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1112 (N.J. Super.
Ct. App. Div. 2002) ("A party that uses unambiguous terms in a contract cannot be relieved from
the language simply because it had a secret, unexpressed intent that the language should have an
interpretation contrary to the words' plain meaning."). *See also WH/PHC Real Estate LP v.*

*Farm Family Cas. Ins. Co.*, 970 A.2d 382, 391 (N.J. Super. Ct. App. Div. 2009) (duty to defend is broader than duty to indemnify).

Until May 11, 2016, Claim Doc had on previous occasions continued to defend balance bills. Thus the prior performance of Claim Doc, the course of conduct under the Agreement, and the mutual understanding of the parties under the Agreement is that Claim Doc must provide post-termination defense of balance bills. *See County of Morris v. Fauver*, 707 A.2d 958, 969 (N.J. 1998) ("Where a contract is ambiguous, courts will consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation . . ."). It is, therefore, plain that the Agreement was designed by the parties to require Claim Doc to continue to defend balance bills post-termination, as a matter of plain meaning, the breadth of Claim Doc's duty to defend, and the prior conduct of the parties under the Agreement.

Claim Doc's definitional argument presented in the letter of May 27 fails because it is inconsistent with the text of the Agreement. Paragraph 1 of the Agreement does not use the defined terms "Health Benefit Claim" or "Referred Appeal," but the Agreement clearly contemplates that these terms are within the scope of services provided under Paragraph 1 of the Agreement: "With respect to determinations of Referred Appeals under Section 1 above . . ." Agreement ¶ 9. *See also id.* ¶ 2 (definition of Referred Appeals includes Health Benefit Claims). Additionally, reading the scope of work entirely out of Claim Doc's post-termination obligations in Paragraph 10 would render those obligations a nullity. Claim Doc's position in refusing to perform under the Agreement, therefore, is without support.

An additional issue exists as a result of your June 28, 2016, email to Karold Kropp of Wirerope Works, Inc., in which you declare your intention to declare to the plan members of Wirerope Works that you will not be providing the services that you contracted to provide. Any communication with the plan members of Wirerope Works that Claim Doc will not honor its clear post-termination obligations will be viewed as an attempt to interfere not only with the INDECS-Wirerope Works relationship, but will undoubtedly be viewed by Wirerope Works as interference with its plan members. By means of this letter, we demand that Claim Doc cease and desist from any communication of its illegal termination directly with Wirerope Works plan members.

Given Claim Doc's intransigence, if Claim Doc does not agree to defend post-termination balance bills for Wirerope Works, LLC, my client will be compelled to file suit to seek a resolution of this matter and enforce the plain terms of the Agreement. You are hereby advised, therefore, to preserve all documents—written or electronic—related to this issue.

Please provide us with your position on this matter within five (5) business days. If I do not hear from you, I will proceed with formal legal proceedings.

Sincerely yours,

BOCHETTO & LENTZ, P.C.

By: _____

George Bochetto

# EXHIBIT F



July 1, 2016

George Bochetto
Bochetto & Lentz, P.C.
1524 Locust Street
Philadelphia, PA 19102

Re: Wirerope Works, Inc. Post-Termination Obligations

Dear Mr. Bochetto:

We are in receipt of your letter dated June 30, 2016.

We disagree with INDECS's position related to the post-termination duties provided in the
Claim DOC-INDECS Agreement for Claims Review, Audit, and Negotiation Services (the
"Agreement"). The post-termination provision of the Agreement uses unambiguous terms
defining the scope of duties to be performed by Claim DOC after the date of termination. The
Parties limited the post-termination duties to those stated in Paragraph 10 which states, in
pertinent part:

> As of the date of termination of this Agreement and the expiration of any run
> out period under any applicable Stop Loss Policy, all rights and obligations of the
> Parties shall terminate, except that (a) CD shall continue to perform its
> obligations under this Agreement **with respect to any Referred Health Benefit
> Claim or Appeal of a Health Benefit Claim** provided that the Plan Document
> continues to name the TPA or the Plan Administrator as a designated decision
> maker with maximum discretionary authority **with respect to such Referred
> Appeals . . .**

Agreement, Par. 10 (emphasis added). The post-termination duties described within Paragraph
10 do not contain reference to "Claim Review Services" as defined in Paragraph 1 which provide
a fuller range of duties during the term of the Agreement, including balance bill defense. The
use of defined terms within Paragraph 10 identifying duties distinct from "Claim Review
Services" creates a clear separation of these duties within the Agreement, accomplished by the
Parties by choosing to use the distinct terms in Paragraph 10. Neither the definition for "Health
Benefit Claim" nor "Referred Appeal" include any reference to balance bill defense or balance
bills generally.

You have agreed that these terms are unambiguous in your statement citing *Schor v. FMS Fin. Corp.*, 814 A.2d 1108 describing the use of unambiguous terms. *See* p. 1, ¶2 of your June 30, 2016 correspondence. Because these terms are unambiguous, the Court may only look to the text of the contract. INDECS's suggestion that the post-termination provision includes duties contained within the definition of "Claim Review Services" even though Paragraph 10 in no way states this is contrary to the clear text of the Agreement and would render this provision meaningless.

It is unclear why you have provided any analysis on contract interpretation involving ambiguities given your acknowledgement the terms are unambiguous. It appears you attempt to create ambiguities because the unambiguous post-termination requirements do not support the position your client seeks. You do this by considering parol evidence which, as you know, is contrary to law. Furthermore, a contract is not ambiguous simply because INDECS urges an alternative interpretation.

Nonetheless, even if the court were to look to the extrinsic evidence you propose, this described evidence does not exist. It would be entirely illogical to conclude that INDECS may reasonably rely on conduct that has never previously occurred. There has never been "past performance" of post-termination services because this is the first instance of termination under this Agreement. No other Plan Sponsor has been party by joinder to this Agreement other than Wirerope Works. Therefore, evidence of "past performance" simply does not exist. Likewise, it is unclear what "course of conduct" evidence would be offered to define post-termination services. Again, since this is the first instance of termination, there is no "course of conduct" upon which INDECS may rely. Thus, although irrelevant to the provision at issue which contains clearly defined and unambiguous terms, this line of argument completely lacks reason.

Finally, it appears you have been misinformed as to the correspondence directed to Wirerope Works members. The June 28, 2016 email you reference was sent simply as a courtesy to Wirerope Works but is independent of the Agreement with INDECS or Wirerope Works. Claim DOC and each member to be contacted have a direct, separate agreement. Neither INDECS nor Wirerope Works are party to these agreements. The only parties are Claim DOC and the member. Thus, INDECS has no ground to prevent Claim DOC from communicating with a direct party of a separate contract regarding the terms of that contract. Thus, your cease and desist request is baseless, and Claim DOC will contact these members in accordance with the terms of those agreements with the members.

Best,

Amy B. Pellegrin, J.D.
General Counsel
Claim DOC, LLC

# EXHIBIT G

GEORGE BOCHETTO*
GAVIN P. LENTZ*
JEFFREY W. OGREN*
DAVID P. HEIM*
VINCENT van LAAR*
BRYAN R. LENTZ*
JOHN A. O'CONNELL*
PETER R. BRYANT*

ALBERT M. BELMONT, III
THOMAS R. BROPHINS
OF COUNSEL

CORA I. O'DONNELL, J.D.
MARIA TROUT
SARETH LENG P.
JOANNE GUARALDO
MARGARET H. KAMIN
VANIA MORACA-KOVACEVIC
PARALEGALS

PRACTICE DEDICATED TO LITIGATION
AND NEGOTIATION MATTERS

## BOCHETTO & LENTZ

ATTORNEYS AT LAW
1524 LOCUST STREET
PHILADELPHIA, PA 19102

———

TELEPHONE: (215) 735-3900
TELECOPIER: (215) 735-2455

———

FIRM WEB SITE:
bochettoandlentz.com

E-MAIL ADDRESS:
jmorrell@bochetto-lentz.com

July 5, 2016

NEW JERSEY OFFICE

———

1200 BRACE ROAD
CHERRY HILL, NEW JERSEY 08034
TELEPHONE NUMBERS:
(856) 751-0535
(866) 451-0631
TELECOPIER: (856) 751-5611

———

* ADMITTED TO NEW JERSEY BAR
+ ADMITTED TO NEW YORK BAR
^ ADMITTED TO D.C. BAR

**Via Email and Certified Mail, R.R.R.**

Amy Pellegrin, Esq.
Claim Doc, LLC
506 3rd Street, Second Floor
Des Moines, IA 50309

Re:   Wirerope Works, Inc., Post-Termination Obligations

Dear Ms. Pellegrin:

As you are aware, I represent INDECS, and write this letter on behalf of INDECS, which is authorized to obtain certain services for Wirerope Works, Inc. from Claim Doc, LLC ("Claim Doc"). This letter is in response to your letter of July 1, 2016. The assertions made in that letter are rejected in their entirety, including the characterizations of the legal position of INDECS.

In response to Claim Doc's notice of anticipatory breach of the Agreement for Claims Review, Audit, and Negotiation Services (the "Agreement") with respect to Claim Doc's obligation to provide legal defense of post-termination balance bills, INDECS will take the following steps.

1.    INDECS will assume responsibility for supplying the services Claim Doc has breached its duty to provide (a legal defense of balance bills with respect to the plan members of Wirerope Works, Inc.) Claim Doc was obligated to provide those services post-termination under ¶ 1(e) of the Agreement.

2.    INDECS will reserve any funds on hand to do so, in a good faith estimate of the expenses of the services required. Claim Doc's breach eliminates any need to pay over any money to Claim Doc in any case.

3.    Claim Doc will be required to pay any excess costs INDECS incurs to provide legal defense of balance bills for plan

members of Wirerope Works, Inc.  Should Claim Doc refuse to
pay any legal defense costs, INDECS will seek recovery from
Claim Doc through further legal action.

4.      Claim Doc will provide any claim data necessary,
including all correspondence and information of any kind, required
to provide a legal defense of balance bills for the plan members of
Wirerope Works, Inc.

INDECS expects full and complete co-operation from Claim Doc.  Be advised that failure
to comply with these conditions will result in legal action, and that INDECS (and Wirerope
Works, Inc.) reserves all rights at law and equity and does not waive any remedies from any
agreement or that otherwise may be available.

Sincerely yours,

BOCHETTO & LENTZ, P.C.

By:

John A. O'Connell

# EXHIBIT H


ClaimDOC
Fair Payment Solutions for Health Plans

July 8, 2016

Harold Kropp  *via electronic mail @ hkropp@wireropeworks.com*
100 Maynard Street
Williamsport, PA 17701

Re:  Claim DOC Service Fees and Notice of Direct Payment Required

Dear Harold:

On July 5, 2016, Claim DOC received notice from INDECS's counsel declaring its intent not to
pay Claim DOC Service Fees on behalf of the Plan pursuant to the terms of the Agreement for
Claims Review, Audit, and Negotiation Services ("Service Agreement) and the associated
Joinder ("Joinder") (collectively, the "Agreements").

Wirerope Works has contracted with INDECS to administer and pay Service Fees on behalf of
the Plan out of the Plan funds.  However, Wirerope Works is the party legally responsible for
these amounts under the Agreements.

In specific, Wirerope Works agreed that, in the event INDECS "fails to forward to CD
compensation or other payments due . . . upon notice to Plan Sponsor by CD, Plan Sponsor shall
make direct payments to CD for any unpaid amounts or future payments due under this
Agreement."  The Service Agreement required that Service Fees were to be paid on behalf of
the Plan by INDECS at the time it made payment for the underlying medical claim.  (Par. 8).
INDECS has failed to comply with this term of the Agreement on behalf of the Plan stemming as
far back as October 2015.

As the Plan Sponsor, it is ultimately Wirerope Work's duty to ensure the Service Fees are
properly paid to Claim DOC to avoid being held liable for a breach of the terms of the
Agreements.  Unfortunately, because of INDECS's failure to properly pay Service Fees as well as
its recent declaration of intent not to pay on behalf of the Plan in the future, Wirerope Works
now faces direct liability unless it makes payment.

This letter serves as formal notice pursuant to the Joinder, Par.6. that Wirerope Works is now
responsible for direct payment of all outstanding invoices. To date, the following invoices have

been sent to INDECS, are past due, and owed by Wirerope Works for immediate payment pursuant to its obligations under the Agreements:

| | |
|---|---|
| Over 90 days overdue: | Invoices dated 10/8/2015 through 3/23/2016, totaling $17,138.29 |
| Over 60 days overdue: | Invoices dated 4/7/2016 through 4/27/2016, totaling $12,768.78 |
| Over 30 days overdue: | Invoices dated 5/19/2016 through 6/5/2016, totaling $37,893.04 |
| Currently due: | Invoices dated 6/6/2016 through 6/28/2106, totaling $46,632.35 |

**Total currently due by Wirerope Works:    $114,432.46**

For your convenience, a copy of the list of these unpaid invoices is included with this letter.

We acknowledge that INDECS is taking the position claims are not to be paid as a result of disputes associated with the scope of Claim DOC's post-termination duties. Although we feel this position is unsupported by law and exposes Wirerope Works to more significant exposure for expenses associated with defending this breach if left unpaid, it also ignores those claims that are irrelevant from this argument that do not include any exposure to post-audit activity due to contractual agreements in place. Of the unpaid invoices, $44,078.94 of these reflect this category of audit.

Once again, INDECS's position does not protect Wirerope Works from liability as the party ultimately responsible for performance of Service Fees. Furthermore, the fact that INDECS's failure to pay on behalf of Wirerope Works pursuant to the Agreements for months – prior to any disputes over post-termination duties – as reflected in the list of past due invoices places the validity of its legal position into further question. Unfortunately, Wirerope Works must now defend itself in light of INDECS's conduct.

In the event Wirerope Works refuses to remit payment directly as required by the Agreements, please understand that Claim DOC has the right to immediately take legal action against Wirerope Works for the damages listed above and for costs associated with recovering these damages. We hope to be able to work with Wirerope Works to resolve these matters without further action.

Please submit direct payment or make arrangements for payment within five business days. Thank you for your attention to this matter.

Sincerely,

Amy B. Pellegrin
General Counsel
Claim DOC, LLC

Case 2:16-cv-04421-KM-JBC   Document 3   Filed 07/22/16   Page 25 of 30 PageID: 40

2:59 PM
07/06/16

## Claim DOC, LLC
## INDWIR A/R Aging Detail
P. 25 of July 6, 2016

| Type | Date | Num | Name | Terms | Due Date | Aging | Open Balance |
|---|---|---|---|---|---|---|---|
| **Current** | | | | | | | |
| **1 - 30** | | | | | | | |
| Invoice | 06/06/2016 | 5613 | INDWIR | | 06/06/2016 | 30 | 752.00 |
| Invoice | 06/05/2016 | 5614 | INDWIR | | 06/06/2016 | 30 | 288.00 |
| Invoice | 06/06/2016 | 5615 | INDWIR | | 06/06/2016 | 30 | 252.00 |
| Invoice | 06/06/2016 | 5616 | INDWIR | | 06/06/2016 | 30 | 288.00 |
| Invoice | 06/06/2016 | 5618 | INDWIR | | 06/06/2016 | 30 | 93.10 |
| Invoice | 06/06/2016 | 5627 | INDWIR | | 06/06/2016 | 30 | 426.78 |
| Invoice | 06/06/2016 | 5628 | INDWIR | | 06/06/2016 | 30 | 168.08 |
| Invoice | 06/06/2016 | 5629 | INDWIR | | 06/06/2016 | 30 | 220.24 |
| Invoice | 06/06/2016 | 5630 | INDWIR | | 06/06/2016 | 30 | 158.78 |
| Invoice | 06/06/2016 | 5631 | INDWIR | | 06/06/2016 | 30 | 36.48 |
| Invoice | 06/06/2016 | 5632 | INDWIR | | 06/06/2016 | 30 | 47.52 |
| Invoice | 06/06/2016 | 5633 | INDWIR | | 06/06/2016 | 30 | 56.88 |
| Invoice | 06/09/2016 | 5625 | INDWIR | | 06/09/2016 | 27 | 4,911.33 |
| Invoice | 06/14/2016 | 4999 | INDWIR | | 06/14/2016 | 22 | 5,634.01 |
| Invoice | 06/14/2016 | 5734 | INDWIR | | 06/14/2016 | 22 | 198.78 |
| Invoice | 06/15/2016 | 5745 | INDWIR | | 06/15/2016 | 21 | 57.84 |
| Invoice | 06/15/2016 | 5746 | INDWIR | | 06/15/2016 | 21 | 1,021.08 |
| Invoice | 06/15/2016 | 5747 | INDWIR | | 06/15/2016 | 21 | 39.40 |
| Invoice | 06/15/2016 | 5748 | INDWIR | | 06/15/2016 | 21 | 468.56 |
| Invoice | 06/15/2016 | 5749 | INDWIR | | 06/15/2016 | 21 | 63.60 |
| Invoice | 06/15/2016 | 5750 | INDWIR | | 06/15/2016 | 21 | 270.57 |
| Invoice | 06/15/2016 | 5751 | INDWIR | | 06/15/2016 | 21 | 1,266.00 |
| Invoice | 06/15/2016 | 5752 | INDWIR | | 06/15/2016 | 21 | 637.08 |
| Invoice | 06/15/2016 | 5753 | INDWIR | | 06/15/2016 | 21 | 143.52 |
| Invoice | 06/15/2016 | 5755 | INDWIR | | 06/15/2016 | 21 | 390.18 |
| Invoice | 06/15/2016 | 5756 | INDWIR | | 06/15/2016 | 21 | 298.08 |
| Invoice | 06/17/2016 | 5735 | INDWIR | | 06/17/2016 | 19 | 8,066.80 |
| Invoice | 06/17/2016 | 5736 | INDWIR | | 06/17/2016 | 19 | 1,297.46 |
| Invoice | 06/20/2016 | 5737 | INDWIR | | 06/20/2016 | 16 | 2,156.75 |

2:59 PM
07/08/16

## Claim DOC, LLC
## INDWIR A/R Aging Detail
As of July 8, 2016

| Type | Date | Num | | Terms | Due Date | Aging | Open Balance |
|---|---|---|---|---|---|---|---|
| Invoice | 06/20/2016 | 5738 | | INDWIR | 06/20/2016 | 16 | 1,297.32 |
| Invoice | 06/20/2016 | 5739 | | INDWIR | 06/20/2016 | 16 | 965.99 |
| Invoice | 06/20/2016 | 5742 | | INDWIR | 06/20/2016 | 16 | 3,744.45 |
| Invoice | 06/20/2016 | 5744 | | INDWIR | 06/20/2016 | 16 | 1,717.33 |
| Invoice | 06/22/2016 | 5740 | | INDWIR | 06/22/2016 | 14 | 87.20 |
| Invoice | 06/22/2016 | 5741 | | INDWIR | 06/22/2016 | 14 | 107.88 |
| Invoice | 06/22/2016 | 5743 | | INDWIR | 06/22/2016 | 14 | 486.48 |
| Invoice | 06/23/2016 | 5546 | | INDWIR | 06/23/2016 | 13 | 5,978.62 |
| Invoice | 06/24/2016 | 5799 | | INDWIR | 06/24/2016 | 12 | 4,481.84 |
| Invoice | 06/24/2016 | 5816 | | INDWIR | 06/24/2016 | 12 | 79.04 |
| Invoice | 06/24/2016 | 5817 | | INDWIR | 06/24/2016 | 12 | 83.94 |
| Invoice | 06/24/2016 | 5818 | | INDWIR | 06/24/2016 | 12 | 83.12 |
| Invoice | 06/24/2016 | 5819 | | INDWIR | 06/24/2016 | 12 | 430.20 |
| Invoice | 06/24/2016 | 5820 | | INDWIR | 06/24/2016 | 12 | 58.80 |
| Invoice | 06/24/2016 | 5821 | | INDWIR | 06/24/2016 | 12 | 35.48 |
| Invoice | 06/24/2016 | 5822 | | INDWIR | 06/24/2016 | 12 | 39.77 |
| Invoice | 06/24/2016 | 5823 | | INDWIR | 06/24/2016 | 12 | 64.68 |
| Invoice | 06/24/2016 | 5824 | | INDWIR | 06/24/2016 | 12 | 208.86 |
| Invoice | 06/24/2016 | 5825 | | INDWIR | 06/24/2016 | 12 | 3,478.94 |
| Invoice | 06/28/2016 | 5526 | | INDWIR | 06/28/2016 | 8 | 246.75 |
| **Total 1 - 30** | | | | | | | **46,632.35** |
| | | | | | | | |
| Invoice | 05/19/2016 | 5417 | | INDWIR | 05/19/2016 | 48 | 262.00 |
| Invoice | 05/19/2016 | 5418 | | INDWIR | 05/19/2016 | 48 | 408.88 |
| Invoice | 05/19/2016 | 5419 | | INDWIR | 05/19/2016 | 48 | 185.00 |
| Invoice | 05/19/2016 | 5420 | | INDWIR | 05/19/2016 | 48 | 85.94 |
| Invoice | 05/19/2016 | 5421 | | INDWIR | 05/19/2016 | 46 | 123.08 |
| Invoice | 05/19/2016 | 5422 | | INDWIR | 05/19/2016 | 48 | 122.04 |
| Invoice | 05/19/2016 | 5423 | | INDWIR | 05/19/2016 | 48 | 122.04 |
| Invoice | 05/19/2016 | 5424 | | INDWIR | 05/19/2016 | 48 | 39.16 |
| Invoice | 05/19/2016 | 5425 | | INDWIR | 05/10/2016 | 48 | 127.98 |
| Invoice | 05/19/2016 | 5426 | | INDWIR | 05/18/2016 | 48 | 211.44 |

31 - 60

Case 2:16-cv-04421-KM-JBC   Document 3   Filed 07/22/16   Page 27 of 30 Page ID: 42

2:59 PM
07/08/16

## Claim DOC, LLC
## INDWIR A/R Aging Detail
P. ... of July 6, 2016

| Type | Date | Num | Name | Terms | Due Date | Aging | Open Balance |
|---|---|---|---|---|---|---|---|
| Invoice | 06/19/2016 | 5427 | INDWIR | | 06/19/2016 | 48 | 89.12 |
| Invoice | 05/19/2016 | 5428 | INDWIR | | 05/19/2016 | 48 | 153.16 |
| Invoice | 05/19/2016 | 5455 | INDWIR | | 05/19/2016 | 48 | 536.48 |
| Invoice | 05/20/2016 | 5453 | INDWIR | | 05/20/2016 | 47 | 968.57 |
| Invoice | 05/20/2016 | 5454 | INDWIR | | 05/20/2016 | 47 | 121.17 |
| Invoice | 05/20/2016 | 5456 | INDWIR | | 05/20/2016 | 47 | 631.95 |
| Invoice | 05/20/2016 | 5457 | INDWIR | | 05/20/2016 | 47 | 568.11 |
| Invoice | 05/20/2016 | 5458 | INDWIR | | 05/20/2016 | 47 | 44.52 |
| Invoice | 05/20/2016 | 5459 | INDWIR | | 05/20/2016 | 47 | 471.43 |
| Invoice | 05/20/2016 | 5460 | INDWIR | | 05/20/2016 | 47 | 97.72 |
| Invoice | 05/20/2016 | 5461 | INDWIR | | 05/20/2016 | 47 | 980.42 |
| Invoice | 05/20/2016 | 5462 | INDWIR | | 05/20/2016 | 47 | 178.78 |
| Invoice | 05/20/2016 | 5483 | INDWIR | | 05/20/2016 | 47 | 107.00 |
| Invoice | 05/23/2016 | 5487 | INDWIR | | 05/23/2016 | 44 | 80.53 |
| Invoice | 05/24/2016 | 5518 | INDWIR | | 05/24/2016 | 43 | 139.61 |
| Invoice | 05/24/2016 | 5517 | INDWIR | | 05/24/2016 | 43 | 242.28 |
| Invoice | 05/24/2016 | 5543 | INDWIR | | 05/24/2016 | 43 | 139.61 |
| Invoice | 05/25/2016 | 5518 | INDWIR | | 05/25/2016 | 42 | 153.24 |
| Invoice | 05/25/2016 | 5519 | INDWIR | | 05/25/2016 | 42 | 492.24 |
| Invoice | 05/25/2016 | 5520 | INDWIR | | 05/25/2016 | 42 | 80.45 |
| Invoice | 05/27/2016 | 5522 | INDWIR | | 05/27/2016 | 40 | 366.68 |
| Invoice | 05/27/2016 | 5523 | INDWIR | | 05/27/2016 | 40 | 38.28 |
| Invoice | 05/27/2016 | 5525 | INDWIR | | 05/27/2016 | 40 | 226.66 |
| Invoice | 05/27/2016 | 5526 | INDWIR | | 05/27/2016 | 40 | 134.66 |
| Invoice | 05/27/2016 | 5527 | INDWIR | | 05/27/2016 | 40 | 167.73 |
| Invoice | 05/27/2016 | 5528 | INDWIR | | 05/27/2016 | 40 | 367.57 |
| Invoice | 05/27/2016 | 5529 | INDWIR | | 05/27/2016 | 40 | 87.64 |
| Invoice | 05/27/2016 | 5530 | INDWIR | | 05/27/2016 | 40 | 109.44 |
| Invoice | 05/27/2016 | 5531 | INDWIR | | 05/27/2016 | 40 | 533.76 |
| Invoice | 05/27/2016 | 5532 | INDWIR | | 05/27/2016 | 40 | 449.76 |
| Invoice | 05/27/2016 | 5533 | INDWIR | | 05/27/2016 | 40 | 69.36 |
| Invoice | 05/27/2016 | 5534 | INDWIR | | 05/27/2016 | 40 | 2,331.00 |

Case 2:16-cv-04421-KM-JBC   Document 3   Filed 07/22/16   Page 28 of 30 PageID: 43

2:09 PM
07/06/16

# Claim DOC, LLC
## INDWIR A/R Aging Detail
### As of July 6, 2016

| Type | Date | Num | P.O. # | Name | Terms | Due Date | Aging | Open Balance |
|------|------|-----|--------|------|-------|----------|-------|--------------|
| Invoice | 03/27/2016 | 5536 | | INDWIR | | 05/27/2016 | 40 | 200.29 |
| Invoice | 05/27/2016 | 5536 | | INDWIR | | 05/27/2016 | 40 | 226.56 |
| Invoice | 05/27/2016 | 3637 | | INDWIR | | 05/27/2016 | 40 | 473.80 |
| Invoice | 05/27/2016 | 5538 | | INDWIR | | 05/27/2016 | 40 | 89.25 |
| Invoice | 05/27/2016 | 3540 | | INDWIR | | 05/27/2016 | 40 | 242.28 |
| Invoice | 05/27/2016 | 5540 | | INDWIR | | 05/27/2016 | 40 | 133.83 |
| Invoice | 05/27/2016 | 5547 | | INDWIR | | 05/27/2016 | 40 | 116.41 |
| Invoice | 05/31/2016 | 5485 | | INDWIR | | 05/31/2016 | 36 | 5,860.71 |
| Invoice | 05/31/2016 | 5521 | | INDWIR | | 05/31/2016 | 36 | 72.60 |
| Invoice | 05/31/2016 | 5524 | | INDWIR | | 05/31/2016 | 36 | 89.25 |
| Invoice | 05/31/2016 | 5641 | | ALDWIR | | 05/31/2016 | 36 | 268.00 |
| Invoice | 05/31/2016 | 5550 | | INDWIR | | 05/31/2016 | 36 | 86.94 |
| Invoice | 05/01/2016 | 5557 | | INDWIR | | 06/01/2016 | 35 | 31.92 |
| Invoice | 06/01/2016 | 5588 | | INDWIR | | 06/01/2016 | 35 | 30.96 |
| Invoice | 06/01/2016 | 5486 | | INDWIR | | 06/01/2016 | 35 | 42.24 |
| Invoice | 06/04/2016 | 5454 | | INDWIR | | 06/04/2016 | 32 | 3,414.81 |
| Invoice | 06/05/2016 | 5511 | | INDWIR | | 06/05/2016 | 31 | 117.60 |
| Invoice | 06/05/2016 | 5539 | | INDWIR | | 06/05/2016 | 31 | 11,269.33 |
| Invoice | 06/05/2016 | 5644 | | INDWIR | | 06/05/2016 | 31 | 1,603.91 |
| Invoice | 06/05/2016 | 5556 | | INDWIR | | 06/06/2016 | 31 | 162.47 |
| Invoice | 06/05/2016 | 5612 | | INDWIR | | 06/06/2016 | 31 | 208.00 |
| **Total 31 - 60** | | | | | | | | **37,893.04** |
| | | | | | | | | |
| **81 - 90** | | | | | | | | |
| Invoice | 04/07/2016 | 5953-2 | | INDWIR | | 04/07/2016 | 90 | 115.08 |
| Invoice | 04/07/2016 | 5968-2 | | INDWIR | | 04/07/2016 | 90 | 937.47 |
| Invoice | 04/27/2016 | 5209 | | INDWIR | | 04/27/2016 | 70 | 3,539.51 |
| Invoice | 04/27/2016 | 5260 | | INDWIR | | 04/27/2016 | 70 | 79.93 |
| Invoice | 04/27/2016 | 5270 | | INDWIR | | 04/27/2016 | 70 | 1,046.20 |
| Invoice | 04/27/2016 | 5273 | | INDWIR | | 04/27/2016 | 70 | 63.53 |
| Invoice | 04/27/2016 | 5274 | | INDWIR | | 04/27/2016 | 70 | 113.33 |
| Invoice | 04/27/2016 | 5276 | | INDWIR | | 04/27/2016 | 70 | 101.44 |
| Invoice | 04/27/2016 | 5278 | | INDWIR | | 04/27/2016 | 70 | 96.95 |

Case 2:16-cv-04421-KM-JBC   Document 3   Filed 07/22/16   Page 29 of 30 PageID: 44

2:59 PM
07/06/16

## Claim DOC, LLC
## INDWIR A/R Aging Detail
### As of July 6, 2016
#### P.O. #

| Type | Date | Num | Name | Terms | Due Date | Aging | Open Balance |
|---|---|---|---|---|---|---|---|
| Invoice | 04/27/2016 | 5279 | INDWIR | | 04/27/2016 | 71 | 204.12 |
| Invoice | 04/27/2016 | 5281 | INDWIR | | 04/27/2016 | 70 | 752.51 |
| Invoice | 04/27/2016 | 5285 | INDWIR | | 04/27/2016 | 70 | 218.36 |
| Invoice | 04/27/2016 | 5272 | INDWIR | | 04/27/2016 | 70 | 75.66 |
| Invoice | 04/27/2016 | 5275 | INDWIR | | 04/27/2016 | 70 | 105.35 |
| Invoice | 04/27/2016 | 6277 | INDWIR | | 04/27/2016 | 70 | 877.04 |
| Invoice | 04/27/2016 | 6282 | INDWIR | | 04/27/2016 | 70 | 150.20 |
| Invoice | 04/27/2016 | 5283 | INDWIR | | 04/27/2016 | 70 | 452.64 |
| Invoice | 04/27/2016 | 5284 | INDWIR | | 04/27/2016 | 70 | 252.00 |
| Invoice | 04/27/2016 | 5117-1 | INDWIR | | 04/27/2016 | 70 | 133.86 |
| Invoice | 04/27/2016 | 5297 | INDWIR | | 04/27/2016 | 70 | 3,503.13 |
| Invoice | 04/27/2016 | 5350 | INDWIR | | 04/27/2016 | 70 | 187.44 |
| | | | | | | | 12,768.78 |
| Invoice | 10/06/2015 | 15(3)N14ACT/06 | INDWIR | | 10/06/2015 | 272 | 99.41 |
| Invoice | 11/06/2015 | 4403 | INDWIR | | 11/06/2015 | 243 | 97.92 |
| Invoice | 11/06/2015 | 4449 | INDWIR | | 11/06/2015 | 243 | 268.00 |
| Invoice | 11/17/2015 | 4451 | INDWIR | | 11/17/2015 | 232 | 151.20 |
| Invoice | 11/17/2015 | 4476 | INDWIR | | 11/17/2015 | 232 | 219.60 |
| Invoice | 11/25/2015 | 4414 | INDWIR | | 11/25/2015 | 224 | 372.80 |
| Invoice | 11/25/2015 | 4545 | INDWIR | | 11/25/2015 | 224 | 155.52 |
| Invoice | 11/25/2015 | 4507 | INDWIR | | 11/25/2015 | 224 | 167.47 |
| Invoice | 12/11/2015 | 4612 | INDWIR | | 12/11/2015 | 208 | 211.06 |
| Invoice | 12/11/2015 | 4648 | INDWIR | | 12/11/2015 | 208 | 201.60 |
| Invoice | 12/11/2015 | 4698 | INDWIR | | 12/11/2015 | 208 | 46.60 |
| Invoice | 12/29/2015 | 4796 | INDWIR | | 12/29/2015 | 190 | 135.48 |
| Invoice | 12/29/2015 | 4797 | INDWIR | | 12/29/2015 | 190 | 136.88 |
| Invoice | 12/29/2015 | 2015194001/7 | INDWIR | | 12/29/2015 | 190 | 189.95 |
| Invoice | 12/29/2015 | 2015908240000 | INDWIR | | 12/29/2015 | 190 | 618.24 |
| Invoice | 01/20/2016 | 4867 | INDWIR | | 01/20/2016 | 168 | 37.44 |
| Payment | 03/17/2016 | | INDWIR | | | | 143.84 |
| Invoice | 02/24/2016 | 4962 | INDWIR | | 02/24/2016 | 133 | 85.51 |

Page 5 of 6

2:59 PM
07/06/16

## Claim DOC, LLC
## INDWIR A/R Aging Detail
### P. o. As of July 6, 2016

| Type | Date | Num | Name | Terms | Due Date | Aging | Open Balance |
|---|---|---|---|---|---|---|---|
| Invoice | 02/24/2016 | 4919 | INDWIR | | 02/24/2016 | 133 | 10,882.54 |
| Invoice | 02/24/2016 | 5001 | INDWIR | | 02/24/2016 | 133 | 234.00 |
| Invoice | 02/24/2016 | 4797.1 | INDWIR | | 02/24/2016 | 133 | 177.66 |
| Invoice | 03/23/2016 | 5058 | INDWIR | | 03/23/2016 | 105 | 144.84 |
| Invoice | 03/23/2016 | 5056 | INDWIR | | 03/23/2016 | 105 | 117.96 |
| Invoice | 03/23/2016 | 5108 | INDWIR | | 03/23/2016 | 105 | 1,050.88 |
| Invoice | 03/23/2016 | 5120 | INDWIR | | 03/23/2016 | 105 | 1,415.85 |
| Invoice | 03/23/2016 | 5139 | INDWIR | | 03/23/2016 | 105 | 45.30 |

Total > 90 | | | | | | | 17,138.29
TOTAL | | | | | | | 114,432.46

# EXHIBIT I

May 6, 2016

Harold,

We were successful in obtaining the short year (6/1/16 to 12/31/16) quote you asked for from Elite. While it gives you what you requested and the traditional self-funded quote options, I would appreciate if we could discuss after you have reviewed it.

You can see the prices and overall costs on the attached spread sheet. I have put them in a simple excel sheet so it is easy to compare and manipulate as you want with your Team.

If you decide that the short year quote is too expensive, we have successfully committed Elite to keeping the 6/1/16 quote in place for now and will review where Wirerope Works, Inc. is this coming Nov/Dec of 2016.

Be assured that we will work with you on the following:

- If it is in your best interest to move to a new plan year on 1/1/17, you can do that.
- If it is in your best interest to keep the current plan in place, due to potential stop loss reimbursements, you have retained that as an option for Wirerope Works.
- I recommend accepting the full year renewal now and we can exercise the renewal option between Nov 15th and Dec 18th to see what is best for Wirerope Works, Inc.

INDECS Renewal Option

As you requested, if you moved to *Claim Watcher*, from Claim DOC be assured of the following:

- The percentage on audited claims will be 10% rather than the 12% that Claim DOC charged. Given the contracts in place, I believe that the overall costs will be significantly reduced from what was paid to Claim DOC.
- In addition, *Claim Watcher* and INDECS will review the fees paid by Wirerope Works for any audits, from the renewal on 6/1/16 to a possible renewal on 1/1/17, to see if any adjustments or rebates, can be considered for Wirerope Works as we avoid legal fees.
- There would be no fee(s) paid on any claim(s) that was paid to a provider with which there is a contract. We will need to continue to audit a small percentage of the SHS bills to make sure there is no "rate creep" on their part.
- Fees will only apply when an audit is completed for any provider. If there is no audit, there will be no fee.

. have been assured by Claim DOC that all of the prior balanced bills are accounted for and under control. This would be for all of the claims paid under the directions of Claim DOC.

Claim DOC contends that they have provided Wirerope Works with an updated listing on all of the balance bills. My understanding, from is that they did give you something but it is not as complete as it should be for all of the claims that were reduced them.

DEF 000416

We will run a report, for all the claims we have processed, showing the provider, the charge, the discount from the audit, employee responsibility and what is left as balanced billed. This should complement any information that was provided to Wirerope Works from the broker.

Their attorney, Amy Pellegrin, in an email from 5/4/16 has given me assurances of the following:

- Claim DOC is by no means choosing what it will and will not defend on behalf of WRW.
- Claim DOC is consistent in their procedures and provide the same diligent efforts to every Balance Bill or Collection Action that arises as a result of an audit.
- Claim DOC spoke with Donna Fuller and quoted her saying; "WRW and two of the questioned individuals were satisfied with the process and progress that has occurred with regard to these balance bills."
- Amy said that the response was "quite positive and at no time did Donna indicate INDECS had been asked to intervene and report back on this matter, likely because they are fully aware of everything that has been and will be done."
- Amy, speaking for Claim DOC wrote; "I hope you can be satisfied with knowing that we are protecting the interests of these members, keeping WRW informed of any updates, and have received positive feedback from WRW as a result of our efforts."

Amy states, somewhat emphatically, that Wirerope Works is very satisfied with Claim DOC and the efforts they have extended for you. I believe that there may be contrary opinions on this topic. Her perspective, I believe, is reflective of others there too.

## Claim Watcher & INDECS

INDECS has been in the self-funded arena since 1983. We are member of the Society of Professional Benefit Administrators (SPBA). We belong to other associations that help us to stay focused on the legal issues, potential legislative issues and the any major change.

We will be successful in getting agreements with the current hospital systems (Hershey, Evangelical, etc.) that have refused to work with Claim DOC. Our owner, Tom Knox, has worked with many of the leaders in the healthcare industry in Pennsylvania and across the country. He is very well respected in the industry and has a proven track record of success.

Tom also owns Homestead Insurance Company. The President is Vince Scbocinski and he has a thirty (30) year record with Cigna, United and some of the Blue organizations in Pennsylvania, the North East, Mid-Atlantic and Mid-West. We will be successful in our negotiation, not due to our reputation, but due to our access to the major networks and health systems. We can be in someone office within hours not in days or weeks as it is currently.

I have been and will continue to be working with you and the Wirerope Team to see that you have the best possible outcomes. If we need to change something, we will not be depended on another entity that has stopped our efforts in the past.

As they say in sailing; "we cannot change the wind...but we can adjust our sails."

DEF 00041.7

The country's health delivery system has been rocked by the enactment of the ACA legislation, mergers of providers, insurance carriers as well as the failures of many of the ACO, state exchanges and the federal exchange. We know there is much more to come. We are not waiting to see what might happen. We are setting our course on what must be done.

We do not believe that this is an indictment of all healthcare delivery systems, per se, but one of providing the best possible options and the most affordable pricing. *Claim Watcher* does that for our clients. We believe in *proactive* position rather than a *reactive* one.

It is essential, for all of the parties involved (i.e. - employer, facilities, providers, TPAs, PBMs, MC entities, etc., etc.), that there is a win-win-win scenario. I believe we have been able to do so for you and Wirerope Works when we have not been impeded in providing you with a resolution. You know the headwinds we faced, when we did what was asked of us by your Team, from the current broker.

We are readily available to Wirerope Works, the provider community and intend to bring our cost effective programs to local businesses that are struggling under the weight of their health plan costs. As you know, we will compensate Wirerope Works for your efforts in the Williamsport area or any other area.

The stop loss quote provided to you is binding until 5/13. After that they could ask for more information and adjust their rates. We will commit to doing whatever it takes to keep you as our partner.

We want to work with you and believe that we have mutual interest to assure mutual success.

### HCS

I have asked for dates that Tom Dolsak, the President of HCS, to visit with Roger, Donna and Marybeth. I have told him that we need to make the program more flexible (less costly) on who it called, when they are called and how to best service employee population. He is more than willing to come there and make any adjustments necessary.

### Wirerope Works Transition requirements from Claim DOC – nothing!

Required:

   1) Approve new ID card
   2) Sign 2 forms

Optional:

   Depending on what you want, we can meet with all/some of the employees or with their spouses where ever and whenever you decide.

GEF 000418