**In The Matter Of:**

*INDECS CORP., et al. v.*
*CLAIM DOC, LLC*

---

*BENJAMIN C. KRAMBECK*
*May 31, 2017*

---

*Geftman Reporting Associates*
*Registered Professional Reporters*
*Certified Court Reporters (NJ)*
*610-608-1040     610-747-0412 fax*
*karynrpr@comcast.net*

Min-U-Script® with Word Index

BENJAMIN C. KRAMBECK                    21

1    me he was going to screw me over.

2         Q.   When did you terminate the

3    relationship between Claim DOC and Needham

4    Business Consultants?

5         A.   I believe it was September 27th of

6    2015.

7         Q.   When did you stop paying Needham

8    Business Consultants from Claim DOC?

9         A.   I still have, I'm still paying them.

10        Q.   Did you pay Needham Business

11   Consultants under its contract with Claim DOC

12   in October 2015?

13        A.   I do not recall.

14        Q.   Do you recall at what date you

15   stopped paying Needham Business Consultants

16   from its original contract with Claim DOC?

17        A.   No.

18        Q.   Did you pay Needham Business

19   Consultants in January 2016 from Claim DOC?

20        A.   I don't recall.

21        Q.   Did Claim DOC pay Needham Business

22   Consultants in February 2016?

23        A.   I do not recall.

24        Q.   Was David Fishbone allowed to

```
 1   compete with Claim DOC?

 2       A.   I believe per the consulting

 3   agreement, I do not -- oh, wait.  Under which

 4   document?

 5       Q.   The Needham Business Consulting and

 6   David Fishbone agreement with Claim DOC.

 7       A.   So not the settlement agreement.

 8       Q.   Correct.

 9       A.   In the original consulting agreement

10   I believe he was allowed to compete.  In the

11   settlement agreement he was not allowed to

12   compete for my specific clients listed in the

13   settlement agreement.

14       Q.   And the settlement agreement listed

15   client of yours.

16       A.   Correct.

17       Q.   And what do you mean by "clients"?

18       A.   There was multiple clients in the

19   agreement if I recall correctly.

20       Q.   But these would have been entities

21   with whom Claim DOC had contracts, correct?

22                MS. RODRIGUEZ:   Objection to

23   form.

24                You can answer.
```

BENJAMIN C. KRAMBECK                    23

```
 1        A.    Yes.
 2   BY MR. O'CONNELL:
 3        Q.    When did you learn that Tom Knox
 4   might open a competitor to Claim DOC?
 5        A.    Approximately November of 2015.
 6        Q.    How did you learn that?
 7        A.    I was on the phone with George Awad
 8   and Tom and we were, they were informing me
 9   that they were looking to possibly purchase
10   ISNT.
11        Q.    Was ISNT a competitor of Claim DOC?
12        A.    No, they were a vendor at one point.
13        Q.    How did they inform you that they
14   would be competing with Claim DOC?
15        A.    They did not inform me specifically
16   that they would be competing with Claim DOC.
17        Q.    Did you infer from their intended
18   purchase of ISNT that they would compete with
19   Claim DOC?
20        A.    As we were still in discussions
21   about potentially a joint venture, I was not
22   made aware that they would be competing with
23   Claim DOC directly.
24        Q.    What was the joint venture?
```

BENJAMIN C. KRAMBECK                    63

1  INDECS, correct?

2      A.   I believe the date was July 2nd, so

3  it wasn't quite there yet, but, yes, about

4  that time.

5      Q.   Did Claim DOC send a termination

6  letter to Wirerope Works on May 11th, 2016?

7      A.   On or about that time, yes.

8      Q.   So this was more than a month after

9  that letter, correct?

10     A.   Correct.

11     Q.   And you said earlier today that this

12 is part of your basis for believing that

13 David Fishbone violated the Settlement Term

14 Sheet, correct?

15     A.   Part of the belief, yes.

16     Q.   Do you know when Claim Watcher

17 signed up Wirerope Works?

18     A.   Their effective date was June 1st.

19          Do I know when they made the

20 decision to move?  It was in May.

21     Q.   Do you know when in May?

22     A.   On or about May 9th.  Or prior to

23 May 9th, internal discussions.  I was on the

24 phone with Harold and Lamar where they were

BENJAMIN C. KRAMBECK                    73

1        A.    Yes.

2        Q.    And it is between INDECS and Claim

3    Watcher according to the first paragraph,

4    correct?

5        A.    Correct.

6        Q.    If you go to the last page of this

7    document, it is signed by Mike Shine and Tom

8    Knox, correct?

9        A.    Yes.

10       Q.    And the date from Mike Shine's

11   signature is May 13th, 2016, correct?

12       A.    Correct.

13       Q.    That is after May 11th, 2016?

14       A.    Correct.  So the joinder -- okay.

15             MR. O'CONNELL:  I'd like to

16   mark this document Krambeck-13.

17             (Exhibit Krambeck-13 is marked

18   for identification.)

19             MS. RODRIGUEZ:  I'd just like

20   to note for the record that Krambeck-12 and

21   Krambeck-13 are documents that apparently

22   were in the production from yesterday

23   afternoon and they're not documents that

24   counsel has had the opportunity to even look

BENJAMIN C. KRAMBECK                    74

```
 1   at before.
 2                   With that, go ahead.
 3   BY MR. O'CONNELL:
 4        Q.   Mr. Krambeck, have you seen the
 5   document that's been marked Krambeck-13
 6   before?
 7        A.   No.
 8        Q.   Does this document say that it's the
 9   Meeting Minutes from January 11th, 2016?
10        A.   Yes.
11        Q.   Does this document say that or give
12   a list of people who were present for the
13   meeting?
14        A.   Correct.
15        Q.   Does this document list Lamar
16   Richards and Harold Kropp of Wirerope Works?
17        A.   Yes.
18        Q.   And Roger Gilliland, Donna Fuller
19   and Marybeth Carpenter also work for Wirerope
20   Works?
21        A.   Yes.
22        Q.   And does this document list persons
23   who are present for INDECS?
24        A.   Yes.
```

BENJAMIN C. KRAMBECK                    75

1       Q.    Mike Shine and David Fishbone were
2   there for INDECS, correct?
3       A.    Yes.
4       Q.    And January 11th, 2016 was after you
5   terminated David Fishbone, correct?
6       A.    Correct.
7       Q.    And it was before the settlement
8   conference before Judge Strawbridge, correct?
9       A.    That's correct.
10              MS. RODRIGUEZ:   Let me just
11  note that there are two dates on the top of
12  the document; one is January 11th, '16 and
13  one is January 11th, 2015.
14  BY MR. O'CONNELL:
15      Q.    The first section of the body of
16  this document is Announcements, correct?
17      A.    Um-hm.
18      Q.    And does it say that there's a new
19  INDECS product announcement "Claim Watcher"?
20      A.    Yes.
21      Q.    And does it describe Claim Watcher
22  as "provides same service as Claim DOC,"
23  correct?
24      A.    Yes.

BENJAMIN C. KRAMBECK                    76

1     Q.   So if a meeting actually took place

2   between Wirerope Works and INDECS in January

3   2016 and this agenda was provided to all

4   parties who say they were present or who were

5   listed as present, would all of those persons

6   know about Claim Watcher?

7           MS. RODRIGUEZ:  Objection.

8   He has no way of knowing who knows about

9   Claim Watcher.

10          The document speaks for

11   itself.

12     A.   The document speaks for itself.

13   BY MR. O'CONNELL:

14     Q.   So if you saw this document yourself

15   on January 11th, 2016 you would be aware of

16   Claim Watcher, right?

17          MS. RODRIGUEZ:  Objection.

18          You can answer.

19     A.   If I saw this document I would see

20   the name; however, I would not know what that

21   is.

22   BY MR. O'CONNELL:

23     Q.   So the fact that the name is

24   immediately followed by "provides same

BENJAMIN C. KRAMBECK                    77

```
 1   service as Claim DOC but managed and operated

 2   by INDECS," wouldn't help you understand what

 3   Claim Watcher is?

 4               MS. RODRIGUEZ:  Objection.

 5   That wasn't his testimony.

 6   BY MR. O'CONNELL:

 7       Q.   Would that description actually help

 8   you understand what Claim Watcher is,

 9   Mr. Krambeck?

10       A.   Not with 100% certainty.

11       Q.   Would it tell you that Claim Watcher

12   is a competitor of Claim DOC?

13       A.   It would infer that.

14       Q.   If Wirerope Works had a discussion

15   about Claim Watcher with INDECS in January

16   2016, wouldn't that explain why Wirerope

17   Works knew about Claim Watcher?

18               MS. RODRIGUEZ:  Objection.

19   Hypothetical.

20       A.   I would have no idea.

21   BY MR. O'CONNELL:

22       Q.   You testified earlier today about a

23   conversation Roger Gilliland had in April

24   2016 where he misidentified Claim Watch --
```

BENJAMIN C. KRAMBECK                    78

```
 1   Claim DOC as Claim Watcher.
 2        A.   See, you're even getting confused.
 3        Q.   Strike that.  I'll reask the
 4   question.
 5                     You testified earlier today
 6   about a conversation that Roger Gilliland had
 7   in which he confused Claim DOC and Claim
 8   Watcher, correct?
 9        A.   That's correct.
10        Q.   And when was that conversation
11   again?
12        A.   April of 2016.
13        Q.   So could Roger Gilliland have
14   learned about the existence of Claim Watcher
15   in January 2016?
16                     MS. RODRIGUEZ:   Objection.
17        A.   I would have no idea.
18   BY MR. O'CONNELL:
19        Q.   You've just been presented with the
20   Meeting Minutes from a meeting in January
21   2016 in which INDECS presented, or the
22   meeting minutes show that INDECS presented
23   Claim Watcher to Wirerope Works, correct?
24        A.   Correct.
```

BENJAMIN C. KRAMBECK                    79

```
 1        Q.    And Roger Gilliland works for
 2   Wirerope Works, correct?
 3        A.    He did at that time.  I do not know
 4   if he does today.
 5        Q.    And Roger Gilliland is listed as
 6   present for these meeting minutes, correct?
 7        A.    Yes.
 8        Q.    And minutes of a meeting are usually
 9   taken after the meeting, correct?
10              MS. RODRIGUEZ:  Objection.
11        A.    Were these produced yesterday?  We
12   have no way of knowing.
13                    Is there a way to evaluate
14   when this document was produced?  Because if
15   it was a Microsoft Word document or something
16   like that where the actual date would be on
17   there and the actual author would be on
18   there, that would be something that perhaps
19   we could comment upon.
20   BY MR. O'CONNELL:
21        Q.    Is it your understanding that
22   minutes are produced after meetings or before
23   meetings?
24        A.    After.
```

BENJAMIN C. KRAMBECK                    122

```
 1                    MR. O'CONNELL:  Let's mark
 2   this as 20.
 3                    (Exhibit Brambeck-20 is marked
 4   for identification.)
 5   BY MR. O'CONNELL:
 6        Q.   Are you familiar with the document
 7   that's been marked Krambeck-20?
 8        A.   I am.
 9        Q.   Is this a letter from you to
10   Wirerope Works --
11        A.   Yes, it is.
12        Q.   -- on Claim DOC letterhead?
13        A.   Correct.
14        Q.   On May 11th, 2016?
15        A.   Correct.
16        Q.   And what were the circumstances that
17   led to you writing this letter?
18        A.   The previous day Harold and Lamar
19   informed me that we were terminated.
20        Q.   Who is "we"?
21        A.   Benefits Captive Re and Claim DOC
22   for the upcoming plan year starting June 1st.
23        Q.   Did that rescind your broker of
24   record?
```

BENJAMIN C. KRAMBECK                      123

1        A.    I don't know what they did with the

2    broker of record or who they assigned as the

3    broker of record.

4        Q.    So in this letter you identified

5    certain services that continue past the, past

6    the date of this letter until July 2nd, 2016,

7    correct?

8        A.    Correct.

9        Q.    And those services are balance bill

10   defense, correct?

11       A.    Correct.  It's itemized, number one,

12   balance bill defense until July 2nd.

13       Q.    And then responding to referred

14   appeals?

15       A.    Stemming from a preferred health

16   benefit claim No. 2, yes.

17       Q.    And then auditing services, correct?

18       A.    With dates of service prior to July

19   2, yes.

20       Q.    So in this document you don't assert

21   that Claim DOC's obligation to perform

22   balance bill defense is discretionary,

23   correct?

24                 MS. RODRIGUEZ:  Objection.

BENJAMIN C. KRAMBECK                    124

```
 1              You can answer.
 2       A.   I did not assert that balance bill
 3   defense was discretionary.
 4   BY MR. O'CONNELL:
 5       Q.   And then at the bottom of the page
 6   you indicate that after July 2nd, 2016 you
 7   will no longer provide balance bill
 8   representation, correct?
 9       A.   " -- we will continue to respond to
10   any referred health appeals beyond the date
11   of termination for those claims that were
12   audited pursuant to the agreement, even if
13   the appeal itself is served on us after the
14   date of termination."  Appeals.
15       Q.   But you say in this document that
16   you are not going to provide balance bill
17   representation.
18       A.   After July 2nd.
19       Q.   Or continue to represent any members
20   whose claims had arisen before -- excuse me,
21   "whose balance bill defenses had arisen
22   before the date of termination."
23              Is that correct?
24       A.   That's what it says.
```

BENJAMIN C. KRAMBECK                    125

```
 1                 MS. RODRIGUEZ:   Objection.
 2   BY MR. O'CONNELL:
 3       Q.   Do you recall what the response was
 4   to this?
 5       A.   I do not.
 6       Q.   Do you recall if anyone --
 7       A.   I'm pretty sure it was a lawsuit
 8   though.
 9       Q.   Do you recall whether Mike Shine
10   e-mailed Claim DOC or sent a letter to Claim
11   DOC about letters that went out May 11th?
12       A.   I recall correspondence as we
13   wrapped up; I don't recall a specific e-mail.
14       Q.   Did you send a letter to Wirerope
15   Works that same day?
16       A.   This was the letter.
17       Q.   I'm sorry.  Did you send a letter to
18   INDECS that same day?
19       A.   On or about that date.
20       Q.   And did that letter also terminate
21   with INDECS?
22       A.   Yes, I think so.
23       Q.   Did your relationship with INDECS
24   get worse after these letters were sent?
```

**BENJAMIN C. KRAMBECK**                    126

```
 1                    MS. RODRIGUEZ:  Objection.
 2        A.   I don't know.
 3   BY MR. O'CONNELL:
 4        Q.   Did you attempt to interfere in
 5   INDECS's business after these letters were
 6   sent?
 7                    MS. RODRIGUEZ:  Objection to
 8   the characterization, letters.
 9                    You can answer.
10        A.   No.
11   BY MR. O'CONNELL:
12        Q.   Did you attempt to interfere with
13   INDECS's customer service with Wirerope Works
14   after these letters were sent?
15        A.   No.
16                    MR. O'CONNELL:  I'd like this
17   marked Krambeck-21.
18                    (Exhibit Krambeck-21 is marked
19   for identification.)
20                    THE WITNESS:  Sorry, this is
21   the first time I'm seeing this.
22   BY MR. O'CONNELL:
23        Q.   Were you aware that Claim DOC
24   directed Wirerope Works customer service
```

BENJAMIN C. KRAMBECK                      169

1    reference-based pricing before Wirerope Works

2    came to INDECS?

3        A.   I don't know.

4        Q.   On the first page of this e-mail Amy

5    Pellegrin says, "Hi, Mike.  Could you please

6    confirm that INDECS is handling Wirerope

7    Works balance bills."  Correct?

8        A.   Um-hm.  Yes.

9        Q.   And this mail is from May 27th,

10   2016, correct?

11       A.   That is correct.

12       Q.   And that's during the 60-day

13   termination period, correct?

14       A.   Yes.

15       Q.   And this is prior to the June 1st

16   renewal date for Wirerope Works, correct?

17       A.   That's correct.

18       Q.   So on May 11th, you sent an e-mail,

19   or you sent a letter to Wirerope Works

20   terminating the agreements, correct?

21       A.   Yes.

22       Q.   And you provided them 60 days'

23   notice, correct?

24       A.   Well, we provided them until July

BENJAMIN C. KRAMBECK                    170

1   2nd.

2        Q.   Right.  And that's 60 days, correct?

3                  MS. RODRIGUEZ:  Objection.

4        A.   The document stands for itself.

5   BY MR. O'CONNELL:

6        Q.   Withdrawn.

7                  You stated that would you

8   provide services until July 2nd, correct?

9        A.   Correct.  On balance bill defense,

10  yeah.

11       Q.   You said would you provide balance

12  bill defense until July 2nd.

13       A.   Well, whatever the document says is

14  what we said.

15       Q.   So why did Claim DOC think that

16  INDECS was going to take over Wirerope Works

17  balance bill defense?

18       A.   I don't know.  You would have to ask

19  Amy.

20       Q.   Amy worked for you, correct?

21       A.   Correct.  As do several other

22  people.

23       Q.   So Amy would have gotten her

24  understanding of what to do at Claim DOC from

**BENJAMIN C. KRAMBECK**                              179

1   required to continue to defend balance bills

2   post termination?

3       A.   I have no idea what Mike Shine

4   believed.

5       Q.   Do you think he was referring to

6   balance bills when he said his understanding

7   was that you will continue to defend ad

8   infinitum?

9       A.   I have no idea what he considered --

10  I have no idea what he is referring to.

11      Q.   So you don't think that e-mail

12  refers to balance bills.

13              MS. RODRIGUEZ:   Asked and

14  answered.

15              You can answer.

16      A.   My answer will stand.  I don't know

17  what he's referring to specifically.  I don't

18  know what he believed or thought or felt when

19  he read this or I don't know what he

20  understood.

21              MR. O'CONNELL:   I'd like this

22  document to be marked 28.

23              (Exhibit Brambeck-28 is marked

24  for identification.)

BENJAMIN C. KRAMBECK                    180

```
 1   BY MR. O'CONNELL:
 2        Q.   Are you familiar with this document,
 3   Mr. Krambeck?
 4        A.   No.
 5        Q.   Really?  You've never seen this
 6   before?
 7        A.   I'm not saying that.  I'm saying I'm
 8   looking at it for the first time in who knows
 9   how long, so....
10        Q.   Mr. Krambeck, is this an assignment?
11        A.   A claim for damages.
12        Q.   Did you execute this agreement?
13        A.   Yes, I did.
14        Q.   Did you execute it for BCR?
15        A.   Um-hm.
16        Q.   Did you execute it for Claim DOC?
17        A.   Yes, I did for both companies.
18        Q.   Did you execute it after this
19   litigation began?
20        A.   I don't recall.  I believe so.
21        Q.   Does it specifically list claims
22   assigned in the middle of the page?
23        A.   It does.
24        Q.   I'd like you to go back to
```

BENJAMIN C. KRAMBECK                    186

```
 1   proposal.  We present their proposal to our
 2   client.
 3                    MR. O'CONNELL:  I'd like this
 4   marked 30.
 5                    (Exhibit Krambeck-30 is marked
 6   for identification.)
 7   BY MR. O'CONNELL:
 8       Q.   Mr. Krambeck, is the document that's
 9   been marked Krambeck-30 payments to BCR for
10   its brokerage fees?
11       A.   Correct.
12       Q.   These are on the Wirerope Works
13   account?
14       A.   Yes.
15       Q.   And in this lawsuit you're asking
16   for continued monthly fees from Wirerope
17   Works to BCR as damages, correct?
18       A.   Correct.
19       Q.   I'd like you to look at Krambeck-11
20   on Page 29.
21       A.   Okay.
22       Q.   Does paragraph 100 of this document
23   refer to BCR's reasonable expectations?
24                    MS. RODRIGUEZ:  Paragraph?
```

BENJAMIN C. KRAMBECK                    187

```
 1        A.   100.   Correct.
 2   BY MR. O'CONNELL:
 3        Q.   And BCR's reasonable expectations
 4   were that it would continue to receive
 5   monthly payments, correct?
 6        A.   Correct.
 7        Q.   In approximately the same amounts
 8   that it did the year before, correct?
 9        A.   Correct.
10             MS. RODRIGUEZ:   Objection.
11        A.   What it says here, during the prior
12   two plan years.
13   BY MR. O'CONNELL:
14        Q.   So what you're asking for in damages
15   is the same monthly fees you had received
16   when you were the broker of record, correct?
17        A.   That's correct.
18        Q.   And usually you would receive those
19   fees when the client came on board with your
20   plan, right?
21        A.   And stayed.  As long as they stayed,
22   we would be owed.
23        Q.   And Wirerope Works terminated with
24   you.
```

BENJAMIN C. KRAMBECK                    188

```
 1      A.    They did.

 2      Q.    Has any other client paid you that

 3 monthly fee after terminating?

 4      A.    If they changed their plan, no.  If

 5 they changed their plan structure, no.

 6      Q.    Do you know if Wirerope moved to

 7 another broker?

 8      A.    I have no idea.

 9      Q.    Did you expect Wirerope to offer its

10 health care plan to its employees going past

11 2016?

12      A.    Did I expect?  Do I expect that they

13 did?  Could you read that again?  I'm sorry,

14 please say that again.

15                  (The court reporter read back

16          the following question:

17              "Q. Did you expect Wirerope to

18          offer its health care plan to its

19          employees going past 2016")

20      A.    I was given no information which

21 would give me another idea, so I would expect

22 that.

23                  MR. O'CONNELL:  Let's mark

24 this as Krambeck-31.
```

Mike Shine
July 14, 2017                                    1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2

 3

 4   INDECS CORP. and WIREROPE    : No.
     WORKS, INC.,                 : 16-4421(KM-JBC)
 5                                :
              Plaintiff(s),       :
 6                                :
              vs.                 :
 7                                :
     CLAIM DOC, LLC,              :
 8                                :
              Defendant(s).       :
 9

10                    -   -   -

11            Friday, July 14, 2017

12                    -   -   -

13         Oral deposition of MIKE SHINE was taken

14   at the offices of Bochetto & Lentz, 1524 Locust

15   Street, Philadelphia, PA 19102, before Brittany

16   Everly, a Court Reporter and Notary Public of the

17   Commonwealth of Pennsylvania, on the above date,

18   commencing at 10:03 a.m.

19

20

21

22

23

24

25
```

Mike Shine
July 14, 2017                                                      200

1   the subsequent year without change except for the

2   Claim Watcher change?

3        A     Correct.  Del had worked for HCS.  So

4   I'm assuming that's how they got the HCS.  But we

5   used them with other clients, too, because that

6   was another time before I got there.  And they had

7   done a study on Envision, and PBMs are

8   transparent.  I believe David did that and

9   suggested that they use Envision.

10       Q     And how about Wirerope's providers for

11  the 2017/2018 year?  Have they changed?

12       A     Wirerope's providers?  No.  They are the

13  same people basically.

14       Q     So the same vendors have carried over

15  from the initial contract in 2015/2016 except for

16  Claim --

17       A     Well, Susquehanna Health has a contract

18  with Wirerope, not with Claim Doc or not with

19  Claim Watcher.

20       Q     I understand, but --

21       A     And there are other people that have a

22  contract with Claim Doc that they resend with

23  Claim Watcher, and then you have PHCS, which is a

24  physician-only network.

25       Q     But as far as -- so what's different?

1   Who is different?

2        A    The Claim Watcher is different than

3   Claim Doc.

4        Q    And that's the only difference from the

5   2015/'16 year to the 2017/'18 year?

6        A    I believe so.

7        Q    Do you recall, did David ever ask you to

8   print off information from INDECS such as audits?

9             Do you recall that?

10       A    I don't recall that.

11       Q    Do you recall David's --

12       A    Well, I wouldn't have to if David would

13  have those.  He was Claim -- he was Claim Doc.

14       Q    Okay.  But after Claim Doc, after

15  September 2015, before he was Claim Watcher, did

16  he ever ask you to print off audit information?

17       A    We'd have -- I don't know what you mean

18  by "print off audit information."  We didn't have

19  anything in the system to print off.

20       Q    So you didn't have any -- you didn't

21  have access to any of Claim Doc's audit review

22  information?

23       A    They would send it to us in paper.

24       Q    And you had it just in paper format?

25       A    That's my understanding, yeah.