## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **INDECS CORP., AND WIREROPE WORKS, INC.,** | Civ. No. 16-4421 (KM) (JBC) |
| **Plaintiffs,** | **OPINION** |
| **v.** | |
| **CLAIM DOC, LLC,** | |
| **Defendant.** | |

### KEVIN MCNULTY, U.S.D.J.:

This matter (to simplify a bit) arises out of a three-way contractual dispute among INDECS Corp. ("INDECS"), Wirerope Works, Inc. ("Wirerope") and Claim Doc, LLC ("Claim Doc"). Plaintiffs INDECS and Wirerope filed their Complaint against Defendant Claim Doc in this Court seeking damages and declaratory relief relating to Claim Doc's alleged breach of contract, breach of fiduciary duty, and duty to indemnify Plaintiffs. (*See* DE 1.) Claim Doc filed amended counterclaims against the Plaintiffs alleging breach of contract, tortious interference, civil conspiracy, and quantum meruit/unjust enrichment. (*See* DE 92.)

Pursuant to a partial settlement agreement among the parties on December 5, 2019, Wirerope and Claim Doc settled and released all claims between them, thus releasing Wirerope from the case. Claim Doc remained as Defendant/Counterclaimant, and INDECS remained as Plaintiff/ Counterclaim-Defendant. (*See* DE 118-2 at 2 n.1.) The case was narrowed further. INDECS and Claim Doc also agreed to resolve and release their respective breach of contract claims against each other (Count I of the Complaint and Counts I and II of the Amended Counterclaim). As a result, the

1

only remaining claims in this matter are these: INDECS's claims of breach of fiduciary duty and breach of the duty to indemnify (Counts II and III of the Compl.), and Claim Doc's tortious interference and civil conspiracy claims (Counts IV and V of the Amended Counterclaims).

Now before the Court are INDECS's motion for summary judgment on Claim Doc's remaining counterclaims (DE 118) and Claim Doc's motion for summary judgment on INDECS's remaining claims. (DE 120.) For the reasons set forth below, I will grant both sides' motions for summary judgment and close the file.

## I.   Background[1]

INDECS is a third-party administrator ("TPA") whose role and responsibility is to administer and manage insurance claims in connection with employee health benefit plans. (*See* INDECS MSJ Ex. A at 20:16–18.) INDECS is owned by Tom Knox and its president is Mike Shine. (INDECS Motion at 4)

---

[1]    For ease of reference, certain key items from the record will be abbreviated as follows:

| | | |
|---|---|---|
| "Compl." | = | Complaint [ECF no. 1] |
| "Amended Counterclaim" | = | Claim Doc's Amended Counterclaims [ECF no. 92] |
| "INDECS's Motion" | = | Memorandum of Law in Support of INDECS's Motion for Summary Judgment as to All Remaining Counterclaims [ECF no. 118-2] |
| "Claim Doc's Motion" | = | Memorandum of Law in Support of Claim Doc's Motion for Summary Judgment [ECF no. 120-1] |
| "INDECS MSJ Ex. ___" | = | Exhibits attached to the Certification of Timothy Duffy in connection with INDECS's Motion [ECF nos. 118-5–118-21] |
| "Claim Doc Opp. Br. Ex. ___" | = | Exhibits attached to Claim Doc's Opposition Brief [ECF no. 120-2] |
| "Opp." | = | Opposition Briefs |

Claim Doc provides claims auditing services for health insurance plans that use reference-based pricing. (*See* INDECS MSJ Ex. B at 14:8–18:9.) A claim auditor challenges the amount that health care providers charge for their services and tries to get these charges reduced to the benefit of the employee health benefit plan. (DE 44 at 2.) Claim Doc is owned by Ben Krambeck. (*See* INDECS MSJ Ex. B at 14:8–18:9.)

Wirerope, a manufacturing company, was a customer of Claim Doc. As discussed in more detail below, Krambeck, on behalf of Claim Doc, introduced INDECS to Wirerope in an effort to get Wirerope to retain INDECS in place of its previous TPA. (*See* INDECS MSJ Ex. C at 198:12–16; INDECS MSJ Ex. D at 46:6–13.)

On June 1, 2015, INDECS and Claim Doc entered into an Agreement for Claims Review, Audit, and Negotiation Services (the "Service Agreement"). (*See* INDECS MSJ Ex. F.) Paragraph 1 of the Service Agreement explains the Scope of Work that Claim Doc would provide INDECS as its claim auditor. The Service Agreement had a one-year term, ending on May 31, 2016, and was to automatically renew for additional one-year terms unless terminated by either party. (*Id.* ¶ 10.) The Service Agreement also provides that either party could terminate the Service Agreement with 60 days' written notice. *Id.*

Two paragraphs of the Service Agreement between INDECS and Claim Doc are critical to the claims regarding post-termination obligations.

The first is Paragraph 1.e:

> [Claim Doc shall] handle appeals filed by providers or members of audit determinations in accordance with the Plan's appeal provisions and arrange for and provide at no cost to the Plan or patient a legal defense against non-patient responsibility in balance bills. If legal defense is not provided for in the Plan Document, then [Claim Doc] will use commercially reasonable efforts to negotiate and settle at its sole discretion, any balance bill attempts with providers on behalf of the Plan and/or Patient;

(*Id.* ¶ 1.e)

The second is Paragraph 10:

As of the date of termination of this Agreement and the expiration of any run out period under any applicable Stop Loss Policy, all rights and obligations of the Parties shall terminate, except that (a) [Claim Doc] shall continue to perform its obligations under this Agreement with respect to any Referred Health Benefit Claim or Appeal of a Health Benefit Claim provided that the Plan Document continues to name the TPA or the Plan Administrator as a designated decision maker with maximum discretionary authority with respect to such Referred Appeals; and (b) INDECS, shall pay on behalf of and with funds provided by the Plan Sponsors, all fees which are due and owing under this Agreement as of the date of termination.

(*Id.* ¶ 10.)

The Service Agreement provides that Claim Doc "shall be acting as a fiduciary of the Plan and shall adhere to the applicable standards of conduct . . . set forth in 29 U.S.C. § 1104(a)(1)(A), (B) and (D)." (*Id.* ¶ 1.)

The Service Agreement also contains an indemnity provision:

Without in anyway limiting [Claim Doc's] obligations under this Agreement including it[s] responsibility for Damages under Section 3 herein, [Claim Doc] shall hold harmless, indemnify, and defend INDECS against any and all losses, claims, expenses (including reasonable attorneys' fees), sanctions, fines, penalties, taxes, damages including, but not limited to, multiple, exemplary or punitive damages, judgments or liabilities whatsoever ("Liabilities") except to the extent such Liabilities are caused by INDECS's breach of this Agreement or its fraud, negligence or willful misconduct with respect to its obligations under this Agreement.

(*Id.* ¶ 6.)

The Service Agreement is part of a broader, three-way arrangement among INDECS, Claim Doc, and Wirerope. Simultaneously, INDECS, Claim Doc, and Wirerope entered into a Joinder Agreement which incorporated the terms and conditions of the Service Agreement. (INDECS MSJ Ex. G at CD000079.)

The Joinder Agreement, too, contains an indemnification provision: Wirerope agrees to "indemnify, hold harmless, and defend INDECS and [Claim Doc] against any and all Damages as that term is defined in the Services Agreement to which INDECS or [Claim Doc] may be subject, **in excess** of what

[Claim Doc] is liable for under the Service Agreement." (*Id.* ¶ 7 (emphasis added).) Paragraph 1 of the Joinder Agreement provides that Wirerope as the "Plan Sponsor" authorizes Claim Doc to be a "co-fiduciary as respects all determinations made by [Claim Doc] for claims subject to the [] Agreement." (*Id.*) The Joinder Agreement does not mention any other entity as being a fiduciary.

Prior to entering into the Service and Joinder Agreements, Claim Doc had engaged an individual named David Fishbone and his business, Needham Business Consulting ("Needham"), to provide certain services related to Claim Doc's business. (*See* INDECS MSJ Ex. T.) Neither Fishbone nor Needham is a party to this action. During this time, Fishbone was also providing consulting services to Tom Knox, the owner of INDECS. Fishbone testified that he had been in a long-standing working relationship with Knox since around 2000. (*See* INDECS MSJ Ex. A at 67:10; INDECS MSJ Ex. J at 20:1–22:22.) By September 2015, however, Fishbone and Krambeck (Claim Doc's owner), had had a falling-out and had terminated their working relationship. Fishbone subsequently filed a lawsuit against Krambeck and Claim Doc in the Eastern District of Pennsylvania (the "EDPa case"). (INDECS MSJ Ex. J at 59:17–60:15; INDECS MSJ Ex. B at 19:23–21:6; INDECS MSJ Ex. K.)

Around late 2015 or early 2016 (after Fishbone and Krambeck had ended their relationship), Fishbone started a company called Claim Watcher. Claim Watcher provided essentially the same claim auditing services as Claim Doc. (*See* INDECS MSJ Ex. J at 60:16–61:15.) It was in January 2016 that Fishbone and INDECS's president, Mike Shine, began marketing Claim Watcher's services to potential customers, including Wirerope. (*Id.* at 185:18–186:1; INDECS MSJ Ex. B at 74:4–75:25.) They were free to do so; during this time period neither Fishbone/Claim Watcher nor INDECS had signed any type of non-compete agreement with Claim Doc. (INDECS MSJ Ex. J at 77:5–13.)

Whatever non-compete obligation there may be did not arise until March 10, 2016. On that date, Fishbone/Needham and Krambeck/Claim Doc had a

settlement conference in the EDPa case. The parties ultimately executed a Settlement Term Sheet which required Claim Doc to pay Needham a certain sum of money. It also required Needham to refrain from attempting to poach certain of Claim Doc's current customers, including Wirerope:

> [Needham shall have] no contact, directly or indirectly, with Wirerope Works, Inc., Gardner Trucking, Inc., and Susquehanna Hospital System for the purpose of convincing any of them to alter or terminate their relationship with Claim Doc, for the same duration as payments are made under this settlement term sheet. For purposes of satisfying its obligation to have no indirect contact with Wirerope Works, Inc. for the purpose of convincing it to alter or terminate its relationship with Claim Doc, Needham shall establish a "Chinese Wall"[2] to isolate itself from information about Wirerope Works, Inc.'s choices of vendors for the coming year. So long as Needham complies with this paragraph, the mere fact that one or more of those entities terminate or change their relationship with Claim Doc shall not constitute or give rise to a claim of breach of this paragraph.

(INDECS MSJ Ex. L ¶¶ 4, 6.) INDECS, however, was not involved in the EDPa case and was not a party to the Settlement Term Sheet. (INDECS MSJ Ex. L.) Fishbone testified that at some point he informed Shine and Knox (owner and president of INDECS) that he, Fishbone, was obligated to refrain from soliciting Wirerope or the other two customers listed in Paragraph 6 of the Settlement Term Sheet. (*See* INDECS MSJ Ex. J at 173:7–18.) Fishbone also testified that in order to implement the information screen, he had INDECS and Knox stop sending him communications of any kind related to Wirerope. (*Id.*)

Harold Kropp, Wirerope's CFO, testified that around the Spring of 2016, Wirerope started considering whether to renew the Joinder Agreement with Claim Doc for the following year. (INDECS MSJ Ex. D at 37:6–13.) Kropp stated that Wirerope had been dissatisfied with Claim Doc's responsiveness and communication regarding the claim auditing process. (*Id.* at 37:11–39:11.) Although Claim Doc made efforts to address Wirerope's concerns, their services and responsiveness did not improve. (*Id.* at 41:3–23.) According to Kropp, it

---

[2]     In lieu of this terminology, I will use the term "information screen."

was at about this time that Mike Shine of INDECS proposed Claim Watcher as an alternative to Claim Doc. (*Id.* at 46:1–25.) Thereafter, Kropp wrote to Krambeck that Wirerope would not be continuing to use Claim Doc's services. Krambeck then sent a letter back to Kropp, dated May 11, 2016, stating that pursuant to Paragraph 10(a) of the Service Agreement, as incorporated in the Joinder Agreement, Krambeck's letter would serve as written notice of Wirerope's intent to terminate the Service and Joinder Agreements and its election not to renew with Claim Doc. (*See* INDECS MSJ Ex. M at 0001109.) Krambeck's letter also stated that the Service and Joinder Agreements would terminate on July 2, 2016. Until that date, Krambeck wrote, Claim Doc would continue to provide the following services: "(1) Balance bill defense; (2) Response to Referred Appeals stemming from a Referred Health Benefit Claim; and (3) Auditing services for Referred Health Benefit Claims with Dates of Service prior to July 2, 2016." (*Id.*) After July 2, 2016, Claim Doc would no longer provide balance bill representation or continue to represent members with pending balance bills. Claim Doc would, however, clean up certain unfinished business: in particular, it would respond to any Referred Appeals for claims that were audited pursuant to the Service Agreement, even if the Appeal was served after the date of termination. (*Id.*)

In a letter from INDECS to Claim Doc dated June 30, 2016, INDECS demanded on behalf of Wirerope that Claim Doc continue to defend balance billing disputes that involved Wirerope employees. (Claim Doc Ex. K.) Shine testified, however, that there had not been any balance billing defense costs for the Wirerope account that needed to be paid, and Kropp could not recall any leftover balance bills that resulted in litigation. (Claim Doc. Ex. J at 153:15–23; Claim Doc. Ex. I at 34:17–35:13.) The parties have not presented any evidence of litigation costs incurred due to balance bill defense for Wirerope.

Fishbone testified that he complied with the terms of the settlement during its term—*i.e.,* from March 10, 2016 (the date on which the settlement conference took place) through May 11, 2016 (the date on which the Settlement

Term Sheet terminated as to Wirerope). In that period, he testified, he did not have any communications with Shine about marketing Claim Watcher to Wirerope. (INDECS MSJ Ex. J at 190:20–191:2.)

The parties agree that the termination of the relationship between Claim Doc and Wirerope terminated the non-compete provisions in the Settlement Term Sheet. At that point, nothing would have prohibited Fishbone from having contact with Wirerope. (*See* INDECS MSJ Ex. L ¶ 6.) Fishbone testified that the first time he reached out to anyone at Wirerope was after Wirerope had already decided to renew its contract with INDECS using Claim Watcher, rather than Claim Doc, as their claim auditor. (*Id.* at 116:22–117:9.) Kropp of Wirerope, in testimony, confirmed that he did not recall having any communication with Fishbone between January 2016 and May 2016. (INDECS MSJ Ex. P at 36:13–37:9.)

Shine, on behalf of INDECS, acknowledged that he marketed Claim Watcher to Wirerope in order to keep Wirerope as an INDECS customer. (INDECS MSJ Ex. C at 147:7–148:2.) Krambeck, on behalf of Claim Doc, testified that he did not recall any non-compete agreement with INDECS and acknowledged that INDECS was allowed to pitch Claim Watcher to Wirerope as a substitute for Claim Doc. (INDECS MSJ Ex. O at 32:20–25, 33:1–8, 88:10–17.)

And that is what INDECS did. On May 6, 2016, INDECS sent Wirerope a proposal outlining what INDECS and Claim Watcher could provide them in the administration of their health benefit plan. (Claim Doc Ex. K.) Eventually, Wirerope, INDECS, and Claim Watcher executed a Joinder Agreement with an effective date of June 1, 2016. (INDECS MSJ Ex. N.)

On July 20, 2016, INDECS and Wirerope filed a Complaint in this Court against Claim Doc, asserting breach of contract, breach of fiduciary duty, and breach of the indemnification provision in the Agreements. (DE 1.) Claim Doc answered the complaint, and on February 11, 2019 filed its counterclaims against INDCES and Wirerope asserting breach of contract, tortious interference, civil conspiracy, and quantum meruit/unjust enrichment. (DE

92.) As stated above, the parties entered into a partial settlement agreement on December 5, 2019, which released Wirerope, leaving only INDECS and Claim Doc in the case. INDECS and Claim Doc also settled and released their mirror-image breach of contract claims. That left only INDECS's claims against Claim Doc for breach of fiduciary duty and indemnity, and Claim Doc's claims against INDECS for tortious interference and civil conspiracy.

INDECS and Claim Doc have each filed a motion for summary judgment on all remaining claims asserted against the other. (DE 118, 120)

## II.   Legal Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322–23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth

9

types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### III.   INDECS Motion for Summary Judgment on Claim Doc's Remaining Counterclaims

#### A. Tortious Interference Counterclaim

In Count IV of its Amended Counterclaim, Claim Doc alleges that INDECS tortiously interfered with the terms of the Settlement Agreement between Krambeck/Claim Doc and Fishbone/Needham in the EDPa matter.

According to Claim Doc, INDECS was aware of the Settlement Agreement's information screen and prohibition on Fishbone/Needham's soliciting Wirerope, but nevertheless communicated with Fishbone for the purpose of moving Wirerope's business from Claim Doc to Claim Watch. Claim Doc argues that when INDECS provided the Claim Watch proposal to Wirerope on May 6, 2016, they interfered with the Settlement Agreement and damaged Claim Doc by causing it to lose Wirerope as a customer.

INDECS, on the other hand, asserts that Claim Doc has not presented evidence that INDECS had knowledge of the specific terms of the Settlement Agreement; that INDECS did not act with the requisite "malice" required to establish a prima facie tortious interference claim; and that even if INDECS did interfere with the Settlement Agreement, INDECS's actions did not lead to any breach or loss of rights under the Settlement Agreement.

For the reasons stated below, I find that summary judgment must be granted in favor of INDECS on the tortious interference claim.

Under New Jersey law, there are four elements in demonstrating a claim for tortious interference with a contract: "(1) the existence of a contract; (2) interference that was intentional and done with malice; (3) the loss of the contract as a result of the interference; and (4) damages." *Berkley Risk Sols., LLC v. Indus. Re-Int'l, Inc.*, No. A-2366-15T1, 2017 WL 4159170, at *5 (N.J. Super. Ct. App. Div. Sept. 20, 2017) (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 751–52 (1989)). Claim Doc has established the first prong of a tortious interference claim by demonstrating the existence of a valid contract, *i.e.,* the Settlement Agreement. *See id.* ("It is undisputed that the Settlement Agreement between defendants and [third party] satisfied the first of

11

these elements."). The primary issue between the parties is whether the actions of INDECS amounted to an intentional interference with the Settlement Agreement, done with malice, and whether Claim Doc's rights under the Settlement Agreement were violated as a result of that interference.

The threshold issue is whether INDECS had knowledge of the terms of the Settlement Agreement, and in particular the non-compete aspects. Although INDECS was neither a party to the Settlement Agreement nor included in any of its terms or provisions, Claim Doc argues that because Fishbone acted as an agent of INDECS, all of his knowledge on the terms of the Settlement Agreement must be imputed to INDECS as his principal.[3]

INDECS does not deny that Fishbone acted as a consultant for it and its owner, Tom Knox; that Fishbone is affiliated with Claim Watcher, a competitor of Claim Doc; that Fishbone shared office space with INDECS; and that he had access to INDECS's computer network. However, INDECS denies that specific knowledge of the Settlement Agreement should be imputed to itself because INDECS "never received, obtained, viewed, or otherwise was made aware of the settlement agreement itself." (DE 126, INDECS Opp. Br. at 2.) I must accept,

---

[3]      For these purposes, New Jersey follows black-letter principles of agency law. "An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Verify Smart Corp. v. Bank of Am., N.A.*, No. CV174248JMVJBC, 2019 WL 1594474, at *5 (D.N.J. Apr. 15, 2019) (citing *Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 337 (1993) (citing Restatement (Second) of Agency § 1 (1958))). "This consent to act on the principal's behalf, or grant of 'authority,' may be 'actual' or 'apparent.'" *Id.* "Actual authority" may be created through written or spoken words or other conduct of the principal which "causes the agent to believe that the principal desires him so to act on the principal's account." *Id.* (citing *Jennings v. Reed,* 381 N.J. Super. 217, 231 (App. Div. 2005)) (internal quotation marks omitted). In contrast, "apparent authority" may be created by written or spoken words, or through any other conduct of the principal which "causes a third person to believe that the principal consents to have the act done on his behalf by the person seeming to act for him." *Id.* Apparent authority essentially "imposes liability, not as the result of an actual contractual relationship, but because of actions by a principal which have misled a third party into believing that a relationship of authority does, in fact, exist." *Id.*

however, that there is good evidence of an agency relationship between Fishbone and INDECS.[4]

In addition, Fishbone testified that at some point—the timing is not clear—he actually informed Shine and Knox (owner and president of INDECS) that he couldn't be contacted about Wirerope or the other customer. This, Fishbone testified, was to implement the information screen required by the Settlement Agreement. (See INDECS MSJ Ex. J at 173:7–18.) INDECS states it did not have knowledge of "the settlement agreement itself"; still, it would have to have been very incurious to have taken Fishbone's statement at face value without asking *why* he could not be contacted on those subjects.

In short, there is at least an issue of fact as to whether knowledge of Fishbone's non-compete obligations of the Settlement Agreement can be attributed to INDECS.

Nevertheless, even assuming that INDECS was aware of the Settlement Agreement, I find that Claim Doc has not established a prima facie case of tortious interference. As stated above, the second element of a tortious interference claim is that the interference was performed with malice. "The term malice is not used in the literal sense requiring ill will toward the plaintiff." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751, 563 A.2d 31, 37 (1989) (citing *Restatement (Second) of Torts* Chapter 37 at 5 (introductory note) (1979)). Instead, it is defined to mean any harm "was inflicted intentionally and without justification or excuse." *Id.* (citing *Rainier's Dairies v. Raritan Valley Farms, Inc.,* 19 *N.J.* 552, 563, 117 *A.*2d 889 (1955)). "To qualify as malice, 'conduct must be both injurious and transgressive of generally accepted standards of common morality or of law.'" *Berkley Risk Sols., LLC v. Indus. Re-Int'l, Inc.*, No. A-2366-15T1, 2017 WL 4159170, at *6 (N.J. Super. Ct. App. Div. Sept. 20, 2017) (citing *Lamorte Burns & Co. v.*

---

[4]     There is an issue, however, as to whether, at the time Fishbone was working with Krambeck and Claim Doc through his own company, Needham, he was *then* acting as an agent for INDECS.

*Walters*, 167 *N.J.* 285, 306–07 (2001)). A court or fact finder may permissibly conclude that "conduct that is fraudulent, dishonest, or illegal amounts to tortious interference." *Id.*, 167 *N.J.* at 307. Ordinary, even aggressive, efforts to obtain business at the expense of a competitor do not qualify.

Here, I do not find that INDECS's actions were done with malice. Claim Doc has admitted that INDECS had a legitimate interest in keeping Wirerope as a client. (*See* INDECS MSJ Ex. O at 32:20–25.) That is within the rules of the game; it is an ordinary incident of business competition, and it does not bespeak any illegitimate intent to harm Claim Doc *per se*. Claim Doc is attempting in effect to treat INDECS as if it were bound by the Settlement Agreement. That pushes the concept of tortious interference too far. The actual party to the Settlement Agreement, Fishbone, has not been shown to have violated it by soliciting Wirerope, directly or indirectly, during its term. INDECS was not a party to the Settlement Agreement, and it had its own legitimate business interests to pursue.

Claim Doc cites the following three emails as evidence of malice:

(1) An email from Claim Doc to INDECS, which Mike Shine then forwarded to Fishbone, regarding the status of the reconciliation and settlement of claims questions after Fishbone had recently been terminated from Claim Doc. (*see* Claim Doc. Opp. Br. Ex. O at ESI 0000008)

(2) A meeting of INDECS and Fishbone with representatives from Wirerope in January 2016, after Fishbone had been terminated by Claim Doc, and a follow-up email from Fishbone that allegedly called into question the adequacy of Claim Doc's management of the Wirerope account (*see* Claim Doc Opp. Br. Ex. P at DEF 003621).

 (3) An October 2015 email that Shine forwarded to his colleagues at INDECS which questioned whether Krambeck's email sent at 3:37 AM was an "alcoholic or drug induced rant" and that questioned Krambeck's "ability to function in a real world environment." (*see* Claim Doc Opp. Br. Ex. Q at DEF 002433.)

I do not find that any of these emails demonstrate actions of tortious interference with the Settlement Agreement, done with malice. The first email was not designated as "confidential," as Claim Doc now asserts. It is an inquiry about the status of the reconciliation or settlement of certain accounts for which Fishbone had previously been responsible prior to his break with Claim Doc. The second follow-up email that Fishbone sent to Wirerope does not, whether fairly or unfairly, disparage Claim Doc's management of the account. It simply explains the different parts of the audit report which Claim Doc would send to Wirerope. The third, October 2015 email that Shine forwarded to his colleagues at INDECS is surely an impolite, even unkind, comment about Krambeck, but it represents Shine's opinion, not Fishbone's. Nor is there any evidence that it was used in some dishonest or defamatory way to harm Claim Doc's relations with customers.

Critically, all of these communications occurred *prior* to the execution of the Settlement Agreement. In no way do they demonstrate that INDECS was tortiously interfering with the Agreement, which did not yet exist.

The analysis need go no farther. I will grant summary judgment to INDECS on Claim Doc's tortious interference counterclaim.

### B. Civil Conspiracy Counterclaim

I will also grant summary judgment to INDECS on Claim Doc's claim of civil conspiracy.

Under New Jersey law, a claim for civil conspiracy consists of a "'combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or an injury upon another, and an overt act that results in damage.'" *LoBiondo v. Schwartz*, 199 N.J. 62, 102, 970 A.2d 1007, 1029–30 (2009) (citing *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177–78, 876 A.2d 253 (2005)). However, "a claim for civil conspiracy cannot survive without a viable underlying tort[.]"

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 533 (D.N.J. 2011).

I have already dismissed the underlying tort of tortious interference, so the claim of civil conspiracy to commit that tort must be dismissed as well. I will grant summary judgment in favor of INDECS on Claim Doc's civil conspiracy counterclaim.

## IV.   Claim Doc's Motion for Summary Judgment on INDECS's Remaining Claims

INDECS's remaining claims against Claim Doc are breach of fiduciary duty and breach of the contractual duty to indemnify. Both claims have as their background the Service Agreement and Joinder Agreement, and Claim Doc's alleged failure to provide post-termination defense of holdover balance billing claims.[5] I therefore start with an examination of the relevant contractual provisions, and then consider the claims individually.

### A. Contractual Ambiguity

"In general, 'contracts are given their plain and ordinary meaning.'" *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 154 (D.N.J. 2013) (citing *M.J. Paquet, Inc. v. N.J. Dept. of Transp.,* 171 N.J. 378, 396, 794 A.2d 141 (2002)). Where the terms of a contract are clear, the court must enforce it as written, and the court cannot rewrite the terms of the contract by substituting a new or different provision from what is clearly expressed in the contract itself. *Id.* (citing *County of Morris v. Fauver,* 153 N.J. 80, 103, 707 A.2d 958, 969 (1998); *E. Brunswick Sewerage Auth. v. E. Mill Associates, Inc.,* 365 N.J. Super. 120, 125, 838 A.2d 494, 497 (App. Div.2004)).

A contract is ambiguous if it is capable of being interpreted in more than one way. *Id.* at 155. In deciding whether a contract is ambiguous, a court must hear the parties' interpretation of the contract and determine if there is any

---

[5]   The parties do not seem to contend that these claims are encompassed by the prior settlement of breach of contract claims. Although they are closely related, I treat them as distinct fiduciary and indemnity claims.

indication that the terms of the contract are susceptible to different meanings. *Id.* "Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." *Id.* "Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning. And once a contract provision is found to be ambiguous, extrinsic evidence must be considered to clarify its meaning." *Id.*

Furthermore, whether "a contract is ambiguous is a legal question for the court." *Order of St. Benedict of New Jersey v. Gianforcaro*, No. A-1158-16T3, 2018 WL 3596282, at *7 (N.J. Super. Ct. App. Div. July 27, 2018) (citing *Nester v. O'Donnell*, 310 N.J. Super. 198, 210 (App. Div. 1997)). However, "if there is an ambiguity, then the resolution of the ambiguity is for the jury." *Id.* (citing *Michaels v. Brookchester, Inc.*, 26 N.J. 379, 388 (1958)).

INDECS cites Paragraphs 10 and 1.e of the Service Agreement, which, in its view, obligate Claim Doc to provide legal defense against non-patient responsibility in balance bills. Claim Doc does not wholly disagree, but argues that these paragraphs define the scope of balance-billing defense during the pendency of the agreement, not after its termination. (*See* Claim Doc Motion at 9.)

Paragraph 10 of the Service Agreement states that post-termination, "[Claim Doc] shall continue to perform its obligations under this Agreement with respect to any Referred Health Benefit Claim or Appeal of a Health Benefit Claim . . ." (INDECS MSJ Ex. F ¶ 10.) The Agreement defines "Referred Appeal" as "any appeal of a denied Health Benefit Claim under the Plan, which shall be referred to [Claim Doc] by the Plan Administrator after audit under this Agreement by [Claim Doc] . . . ." (*Id.* ¶ 2.) The Agreement also defines "Health Benefit Claim" as "a claim for benefits filed by a participant in the Plan, where the request for approval of treatment or services or the rendering of services or supplies occurred during a Plan Year or calendar year applicable under the

17

term of this Agreement." (*Id.*) The Agreement does not, however, specifically define "*Referred* Health Benefit Claim" or "*Appeal of* a Health Benefit Claim."

Putting the definitions together, I find it likely that "Referred Health Benefit Claim" would mean a claim for benefits filed by a participant in the Plan that was referred to Claim Doc. An "Appeal of a Health Benefit Claim" would refer to an appeal of a Health Benefit Claim that was denied under the Plan. The contract is ambiguous, however, as to what Claim Doc's obligations are in connection with such Referred Health Benefit Claims and Appeals of Health Benefit Claims. Paragraph 1.e of the Service Agreement states that Claim Doc shall "handle appeals filed by providers or members of audit determinations in accordance with the Plan's appeal provisions **and** arrange for and provide at no cost to the Plan or patient a legal defense against non-patient responsibility in balance bills . . . ." (emphasis added.) Reasonable minds could disagree on whether that contractual provision means that the provision of legal defense against balance bills is part of Claim Doc's obligations in "handl[ing] appeals," or if it is a separate obligation, apart from the handling of appeals. Post-termination, the obligations are if anything less clear.

The extrinsic evidence that INDECS cites in its Opposition Brief is unhelpful in resolving this ambiguity. First, INDECS relies on the testimony of Mike Shine that Claim Doc had assured him that they would provide legal support, even after the Agreements with a client were terminated. *See* INDECS Opp. Br. Ex. 1 at 12:5-25. Krambeck, however, has testified that he never understood Claim Doc's post-termination obligations to include balance billing defense. (*See* Claim Doc MSJ Ex. A at 113:5–114:3.) There is evidence that Shine discussed with Claim Doc employees past examples of Claim Doc's having provided post-termination balance billing defense for other clients; Fishbone, too, testified that Claim Doc had provided this service to other clients. Such past-practice evidence falls short of establishing that Claim Doc undertook to provide post-termination balance billing defense as to this account. INDECS points to Claim Doc's being prepaid to provide balance bill defense, but again, this does not necessarily imply that the obligation to

18

undertake such defense continued past the termination date of the Agreements.

In short, I find the agreements ambiguous on the point; I therefore cannot award summary judgment on the basis of the agreements themselves. Nevertheless, I will grant summary judgment in favor of Claim Doc on INDECS's remaining claims for the reasons stated below.

### B. Breach of Fiduciary Duty

INDECS alleges in its Complaint that Claim Doc breached its fiduciary duty to them by failing to "provide balance bill defense to Wirerope health benefit plan members," which, *a fortiori,* failed to discharge its fiduciary duty to exercise "the skill, care, and diligence of a prudent [person]." (Compl. ¶ 76.)

INDECS argues that under Paragraph 1 of the Joinder Agreement, "Claim Doc became a fiduciary for all of its actions" undertaken pursuant to that Agreement. (INDECS MSJ Ex. G ¶ 1.) The text of that paragraph, however, is actually more limited: it provides that Wirerope as Plan Sponsor "hereby authorizes [Claim Doc] to be a co-fiduciary as respects all determinations made by [Claim Doc] for claims subject to the Service Agreement." *Id.* The Service Agreement refers to a "fiduciary" just once; it provides that, "[i]n performing its duties hereunder, [Claim Doc] shall be acting as a fiduciary of the Plan and shall adhere to the applicable standards of conduct, which are set forth in 29 U.S.C. § 1104(a)(1)(A), (B) and (D)." (INDECS MSJ Ex. F ¶ 1.) The Service Agreement defines "Plan" as any "self-funded ERISA and non-ERISA health plans."

So Claim Doc is a fiduciary with respect to somebody. I find no language in these contracts, however, which designates Claim Doc as a fiduciary in relation to INDECS. The Service Agreement designates Claim Doc to be a fiduciary with respect to the Plan, not INDECS. The Joinder Agreement designates Claim Doc as a "co-fiduciary" with Wirerope, the Plan sponsor; but even if the other co-fiduciary were INDECS, that would not imply a fiduciary duty running from Claim Doc to INDECS.

As a result, I will grant Claim Doc's motion for summary judgment on INDECS's breach of fiduciary duty claim.

### C. Duty to Indemnify Plaintiffs

Paragraph 6 of the Service Agreement states that Claim Doc "shall hold harmless, indemnify, and defend INDECS against any and all losses, claims, expenses (including reasonable attorneys' fees), sanctions, fines, penalties, taxes damages including, but not limited to, multiple, exemplary or punitive damages, judgments or liabilities whatsoever. . . ."  INDECS alleges that Claim Doc's failure to "defend the balance bills, . . . thereby causing this litigation, require[s] indemnification for Plaintiffs by Claim Doc." Compl. ¶¶ 83, 85.

Claim Doc responds that summary judgment must be granted in its favor because INDECS lacks standing under Article III of the Constitution to bring this claim, since it has not suffered an injury. Relatedly, it asserts that Wirerope has not incurred any defense costs related to post-termination balance billing, so there is nothing for INDECS to indemnify.

I agree with Claim Doc and find that INDECS has not suffered an injury in fact. In order to bring a suit in federal court, a plaintiff must demonstrate that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016), *as revised* (May 24, 2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S. Ct. 2130 (1992)). A "concrete" injury is one that is "de facto" and must actually exist. *Id.* at 1548 (citing Black's Law Dictionary 479 (9th ed. 2009)). The Supreme Court has held that when using the adjective "concrete" they mean to convey an injury that is "real and not abstract." *Id.* (citing Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967)).

Here, I find that the damages which INDECS claims are not concrete or actual so as to confer standing to pursue its indemnification claim against Claim Doc. As stated above, Harold Kropp, Wirerope's CFO, testified that he could not recall whether there were any leftover balance bills that resulted in litigation (*i.e.,* required a defense). He acknowledged that if there were such balance bills, he should be aware of them. (Claim Doc. MSJ Ex. I at 34:17–35:13.) Shine also testified that there had not been any legal fees that needed to be paid in connection with balance billing. (Claim Doc. MSJ Ex. J at 153:15–23.) INDECS admits that it did not "suffer any 'damages' in the traditional sense, e.g., out-of-pocket monetary payment to attorneys."

Rather, Shine claimed that he was required to "expend a number of hours to address numerous issues which arose from Claim Doc's actions." (*See* Cert. of Mike Shine, DE 122-2.) Shine certified that those efforts included:

- Communicating by phone and email with Claim Doc personnel to obtain all relevant information regarding balance bills, including numerous follow-up request due to Claim Doc's lack of response;

- Communicating by phone and email with Wirerope's staff regarding how balance bills would be addressed;

- Answering calls and addressing inquiries made by Wirerope employees concerning outstanding bills;

- Communicating by phone and email with certain medical providers and facilities concerning balance bills and Wirerope employees;

- Communicating by phone and email with Claim Watcher, the new vendor providing claims review services for Wirerope, concerning balance bill issues.

*Id.* Based on the above, Shine "estimate[s]" that he spent approximately 160 hours working on balance bill issues from May – September 2016, and that because the rate which should apply to these services is $200, the value of his time expended is $32,000. *Id.*

Shine's lost time value, however, is not connected to the claimed breach of the duty to defend holdover balance billing claims; everybody agrees that there were no such claims requiring a defense. The time expended was the result of dealing with the administrative issues that followed the termination of the Agreements, and not in connection with the "legal defense . . . in balance bills." (*See* INDECS MSJ Ex. F ¶ 1.e.) Moreover, Shine's certification only contains his *post hoc* assessment of what he thinks his time was worth, and his personal opinion of the "market rate" which would apply to his services. There is no evidence in the record that he was entitled to be compensated by Claim Doc for his time at all, or that he had ever charged Claim Doc an hourly rate for his personal work on the Wirerope account. At best, Shine seems to be saying that he expended a great deal of effort in ascertaining that Claim Doc had *not* deprived INDECS of anything to which it had been entitled under the contract.

Thus, I find that the Shine certification does not demonstrate the type of concrete or actual injury, *resulting* from the claimed breach, that would be required in order to establish standing on INDECS's indemnification claim. In the alternative—even if the matter is not viewed as one of standing—this is a no-damages claim. Either way, I will grant summary judgment to Claim Doc on INDECS's remaining claims.

## V.      Conclusion

For the reasons set forth above, I will grant INDECS's motion for summary judgment on Claim Doc's remaining counterclaims (DE 118) and will grant Claim Doc's motion for summary judgment on INDECS's remaining claims (DE 120).

An appropriate order follows.

Dated: October 2, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

22